

Search for Cases by: Select Search Method...

Judicial Links | eFiling | Help | Contact Us | Print

Logon

**1216-CV23784 - STAHR D ASHURST ET AL V J P MORGAN RETIREMEN ET AL (E-CASE)**

| Case Header | Parties & Attorneys | Docket Entries | Charges, Judgments & Sentences | Service Information | Filings Due | Scheduled Hearings & Trials | Civil Judgments | Garnishments/ Execution |
|---|---|---|---|---|---|---|---|---|

This information is provided as a service and is not considered an official court record.

Sort Date Entries: ⦿ Descending ◯ Ascending     Display Options: All Entries

---

**08/15/2013**    **Motion Granted/Sustained**
       **Associated Entries:** 07/16/2013 - Motion Filed
       **Order**
       Order Allowing Attorneys to Appear Pro Hac Vice

**08/13/2013**    **Case Mgmt Conf Scheduled**
       **Scheduled For:** 09/04/2013; 8:30 AM ; CHARLES H MCKENZIE; Jackson - Independence

**07/17/2013**    **Cert Serv Resp Req Prod Doc Th**
       Certificate of Service on Discovery Responses; Electronic Filing Certificate of Service.
       **Filed By:** DANIEL B HODES

**07/16/2013**    **Motion Filed**
       Defendants Motion for Admission of Attorneys to Appear Pro Hac Vice; Exhibits A-E to Motion for
       Admission of Attorneys to Appear Pro Hac Vice; Electronic Filing Certificate of Service.
       **Filed By:** JOSEPH MICHEAL REBEIN
       **On Behalf Of:** J P MORGAN RETIREMENT PLAN SERVICES LLC, JP MORGAN CHASE & CO,
       JPMORGAN ASSET MANAGEMENT HOLDINGS INC, J P MORGAN INVEST HOLDINGS LLC, DAVID
       EMBRY, JENNIFER MENDICKI O NEILL, JAMES E STALEY
       **Associated Entries:** 08/15/2013 - Motion Granted/Sustained

**06/21/2013**    **Answer Filed**
       Defendants Answer to Plaintiffs First Amended Petition; Exhibit A; Electronic Filing Certificate of Service.
       **Filed By:** JOSEPH MICHEAL REBEIN
       **On Behalf Of:** J P MORGAN RETIREMENT PLAN SERVICES LLC, JP MORGAN CHASE & CO,
       JPMORGAN ASSET MANAGEMENT HOLDINGS INC, J P MORGAN INVEST HOLDINGS LLC, DAVID
       EMBRY, JENNIFER MENDICKI O NEILL, JAMES E STALEY

**06/18/2013**    **Motion Granted/Sustained**
       **Associated Entries:** 05/24/2013 - Motion for Extension of Time
       **Order**
       Order Extending Time

**06/17/2013**    **Cert Serv of Interrog Filed**
       Certificate of Service of Defendants First Interrogs, First Requests for Production of Docs, and First
       Requests for Admissions to Each Plaintiff; Electronic Filing Certificate of Service.
       **Filed By:** JOSEPH MICHEAL REBEIN
       **On Behalf Of:** J P MORGAN RETIREMENT PLAN SERVICES LLC, JP MORGAN CHASE & CO,
       JPMORGAN ASSET MANAGEMENT HOLDINGS INC, J P MORGAN INVEST HOLDINGS LLC, DAVID
       EMBRY, JENNIFER MENDICKI O NEILL, JAMES E STALEY

**06/14/2013**    **Cert Serv Answers Interrog Fil**
       Certificate of Service of Defendants Response to 1st Interrogs and Defendants Response to Plaintiffs
       First Requests for Production; Electronic Filing Certificate of Service.
       **Filed By:** JOSEPH MICHEAL REBEIN

**On Behalf Of:** J P MORGAN RETIREMENT PLAN SERVICES LLC, JP MORGAN CHASE & CO, JPMORGAN ASSET MANAGEMENT HOLDINGS INC, J P MORGAN INVEST HOLDINGS LLC, DAVID EMBRY, JENNIFER MENDICKI O NEILL, JAMES E STALEY

| | |
|---|---|
| 05/24/2013 | **Motion for Extension of Time** |
| | Defendants Unopposed Motion for Extension of Time to Answer or Otherwise Respond to Plaintiffs Amended Petition and Suggestions in Support; Proposed Order; Electronic Filing Certificate of Service. |
| | **Filed By:** JOSEPH MICHEAL REBEIN |
| | **On Behalf Of:** J P MORGAN RETIREMENT PLAN SERVICES LLC, JP MORGAN CHASE & CO, JPMORGAN ASSET MANAGEMENT HOLDINGS INC, J P MORGAN INVEST HOLDINGS LLC, DAVID EMBRY, JENNIFER MENDICKI O NEILL, JAMES E STALEY |
| | **Associated Entries: 06/18/2013 - Motion Granted/Sustained** |
| 05/21/2013 | **Motion Withdrawn** |
| | Withdrawal of Plaintiffs Motion for Leave to File Second Amended Petition; Electronic Filing Certificate of Service. |
| 05/16/2013 | **Order** |
| | motion to remand |
| 02/07/2013 | **Hearing/Trial Cancelled** |
| | Scheduled For: 02/07/2013;  10:00 AM ;  CHARLES H MCKENZIE;  Jackson - Independence |
| | **Removed to Fed Court** |
| 01/01/2013 | **Notice** |
| | Per Administrative Order, Transfer to Judge McKenzie, Division 13, sitting in Independence 1-NOTIC |
| 12/31/2012 | **Judge Assigned** |
| 10/22/2012 | **Motion no Longer an Issue** |
| | Case was removed to Federal Court |
| | **Associated Entries: 09/28/2012 - Motion for Leave** |
| 10/11/2012 | **Notice** |
| | of Removal to the United States District Court for the Western District of Missouri, Western Division 1-NOTIC |
| | **Filed By:** J P MORGAN RETIREMENT PLAN SERVICES LLC |
| 09/28/2012 | **Motion for Leave** |
| | to file 2nd amended petition 1-MLEAV |
| | **Filed By:** STAHR D ASHURST |
| | **Associated Entries: 10/22/2012 - Motion no Longer an Issue** |
| | **Proposed Order Filed** |
| | 1-FPORD |
| 09/25/2012 | **Correspondence Filed** |
| | Service Instructions 1-FCORR |
| | **Notice** |
| | of Case Management Conference February 7, 2013 at 10:00 am in Division 13 |
| 09/21/2012 | **Correspondence Sent** |
| | 1029 7 copies of Amended petition needed for service |
| 09/20/2012 | **Amended Motion/Petition Filed** |
| | 1-FAMMF |
| | **Filed By:** STAHR D ASHURST |
| 09/13/2012 | **Case Mgmt Conf Scheduled** |
| | **Associated Entries: 02/07/2013 - Hearing/Trial Cancelled** |

**Scheduled For:** 02/07/2013; 10:00 AM ; CHARLES H MCKENZIE; Jackson - Independence

| | |
|---|---|
| 09/12/2012 | **Confid Filing Info Sheet Filed** |
| | 1-FINSH |
| | **Filed By:** RANDALL E HENDRICKS |
| | **Pet Filed in Circuit Ct** |
| | 1-APTCC |
| | **Judge Assigned** |

Case 4:13-cv-00803-BP   Document 3-1   Filed 08/16/13   Page 3 of 100

https://www.courts.mo.gov/casenet/cases/searchDockets.do          8/16/2013

# IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI, AT INDEPENDENCE
## SIXTEENTH JUDICIAL CIRCUIT OF MISSOURI
### (INDEPENDENCE)

2012 SEP 12 PM 4:29

FILED-CIRCUIT COURT
JACKSON CO. MO-I

Stahr D. Ashurst )
1609 S. Whitney Dr. )
Independence, MO 64057 )
)
Valerie Arrocha )
3744 Elmwood )
Kansas City, MO 64128 )
)
LeAnn M. Belew )
521 SW Moore )
Blue Springs, MO 64014 )
)
Linda Sue Beltz )
2601 S. Milton Dr. )
Independence, MO 64055 )
)
Lori Boniedot )
1331 S. Randall Rd. )
Independence, MO 64055 )
)
Sheila R. Brock )
2848 SW Carlton Dr. )
Lee's Summit, MO 64082 )
)
Kathleen Burmeister )
511 SE 19th St. )
Oak Grove, MO 64075 )
)
Cathleen Cameron )
318 11th Pl. )
Rogers, AR 72756 )
)
Jeanetta Cobb )
3605 NW Hidden Pointe Dr. )
Blue Spring, MO 64015 )
)
Kathy Cox )
405 N. Cochise Dr. )
Independence, MO 64056 )
)
Heather D. Craft )
1427 ½ South Sterling Ave. )

**1216 - CV23784**

CASE NO.

DIVISION

1

Independence, MO 64052                    )
                                          )
Brenda S. Dannaldson                      )
829 N. Ponca Dr.                          )
Independence, MO 64056                    )
                                          )
Cicilyn Davis                             )
4906 Wallace Ave.                         )
Kansas City, MO 64129                     )
                                          )
Terri Davis                               )
17917 S. Hilltop Rd.                      )
Pleasant Hill, MO 64080                   )
                                          )
Shirley Dieckhoff                         )
721 N. Sioux Ave.                         )
Independence, MO 64056                    )
                                          )
Gayla Dowell                              )
16921 York Ave.                           )
Independence, MO 64055                    )
                                          )
Heather Downey                            )
3572 NE Austin                            )
Lee's Summit, MO 64064                    )
                                          )
Wilma J. Ebert                            )
950 S. State Route 7                      )
Independence, MO 64056                    )
                                          )
Karen Euritt                              )
26307 E. Blue Mills Rd.                   )
Sibley, MO 64088                          )
                                          )
Margaret A. Evans                         )
10216 E. 96th St.                    )
Kansas City, MO 64134                     )
                                          )
Sara Ferguson                             )
2905 NW 4th St. Terr.                )
Blue Springs, MO 64014                    )
                                          )
Cathleen R. Frantz                        )
707 W. Hwy 224                            )
Wellington, MO 64097                      )
                                          )

2

Lynn Frentrop
1213 NE 82nd Terr.
Independence, MO 64118

Charlene Fitzhugh
8708 E. 92nd Pl.
Kansas City, MO 64138

Kimberly Foudree
4424 NE Shadow Valley Cir.
Lee's Summit, MO 64064

Emily Galloway
3613 Lake Shore Dr.
Blue Springs, MO 64014

Amy Gardipee
PSC 812 Box 3130
FPO AE 09627

Sharon Grammer
2017 N. Ponca Dr.
Independence, MO 64058

Linda Green
6515 NW Quail Run Dr.
Parkville, MO 64152

Lynn Green
1410 E. Salem Ln.
Olathe, KS 66062

Patricia Hake
304 NE Forest Ave., Apt. C
Lee's Summit, MO 64063

Kayla Hale
526 El Lago Circle
Climax Springs, MO 64324

Minnie Henson
12206 E. 56th Terrace
Kansas City, MO 64133

Myrle Hill
5279 Spruce

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)          )
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

3

Kansas City, MO 64130

Janice Hohenburg
16612 E. Gudgell, Apt. D
Independence, MO 64055

Deborah Hopkins
19202 E. 28th St. S.
Independence, MO 64057

Vicki Hopkins
27606 Rogers Rd.
Buckner, MO 64016

Lynn Huff
3611 S. Bolger Ct.
Independence, MO 64055

Melanie Jefferson
1405 E. 66th St.
Kansas City, MO 64131

Soteria Jenkins
2514 N. Six Mile Church Rd.
Independence, MO 64058

Cynthia Jones
3337 Askew
Kansas City, MO 64128

Robert Kordalski
17925 Mission Rd.
Stillwell, KS 66085

Tamara Liber
19703 NE 197th Terr.
Smithville, MO 64089

Paula Luna
200 S. Shrank Ave.
Independence, MO 64056

Pamala McGee
1900 N. Concord Rd.
Independence, MO 64058

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

4

Leona McGinnis )
16414 E. Cogan Rd. )
Independence, MO 64055 )
)
Michael McMurray )
506 Deer Ln. )
Pleasant Hill, MO 64080 )
)
Saundra McRae )
34609 Pink Hill Rd. )
Grain Valley, MO 64029 )
)
Cecil Morris )
3813 SW Windmere Dr. )
Lee's Summit, MO 64082 )
)
Mowetha Ndettei )
226 Douglas Rd. )
Warwick, RI 02886 )
)
Sandra Oertwig )
E. 20th St. S. )
Independence, MO 64050 )
)
Tamara O'Hare )
5401 S. Harding St. )
Oak Grove, MO 64075 )
)
Sheri Orr-Davidson )
17676 N. Union Rd. )
Lawson, MO 64062 )
)
Jo Parker )
6414 Ridgeway Ave. )
Kansas City, MO 64133 )
)
Diane Postlethwait )
3603 S. Drumm Ave. )
Independence, MO 64055 )
)
Bernice Pryor )
1801 E. 97th Terr. )
Kansas City, MO 64131 )
)
Linda Rohaus )
1124 SW Eastman St. )

5

Blue Springs, MO 64015                                          )
                                                               )
Connie Schmidt                                                 )
18004 E. 18th St. N.                                           )
Independence, MO 64058                                         )
                                                               )
Beatrix Schmitt                                                )
5702 N. Norton Pl.                                             )
Gladstone, MO 64119                                            )
                                                               )
Shirley Scott                                                  )
19400 E. 37th Terr. Ct. S. Apt. 316                            )
Independence, MO 64057                                         )
                                                               )
Peggy Smith                                                    )
12016 Markham Rd.                                              )
Independence, MO 64052                                         )
                                                               )
Troy Spencer                                                   )
14350 W. 187th Terr.                                           )
Olathe, KS 66062                                               )
                                                               )
Carolyn Thomas                                                 )
1903 E. 16th                                                   )
Kansas City, MO 64127                                          )
                                                               )
Deborah P. Thomas                                              )
4020 Lawn Ave.                                                 )
Kansas City, MO 64130                                          )
                                                               )
Shanna Thompson                                                )
31 NW 102nd St.                                                )
Kansas City, MO 64155                                          )
                                                               )
Paris Valleau                                                  )
11623 E. 85th St.                                              )
Raytown, MO 64138                                              )
                                                               )
Virginia Wanamaker                                             )
1712 Ashley Dr.                                                )
Independence, MO 64058                                         )
                                                               )
Joyce Webb                                                     )
7500 E 108th St.                                               )
Kansas City, MO 64134                                          )
                                                               )

6

Cynthia White                                       )
1300 Cottonwood Dr.                                 )
Greenwood, MO 64034                                 )
                                                    )
Teresa White                                        )
4009 S. Maybrook Ave.                               )
Independence, MO 64055                              )
                                                    )
Chandra Williams                                    )
503 Palomino Ln.                                    )
Ogden, KS 66517                                     )
                                                    )
Eavy Wilson                                         )
8526 Bruns Rd.                                      )
Richmond, MO 64085                                  )
                                                    )
Sheila Wittmeyer                                    )
36 Anchor Dr.                                       )
Lake Tapawingo, MO 64015                            )
                                                    )
                                                    )
                                                    )
                      PLAINTIFFS,                   )
                                                    )
        vs.                                         )
                                                    )
J.P. MORGAN RETIREMENT PLAN                         )
SERVICES, LLC,                                      )
Serve at:        6580 Sprint Parkway               )
                 Overland Park, KS 66251           )
                                                    )
JP MORGAN CHASE & CO.                               )
Serve at:        270 Park Avenue                   )
                 New York, NY 10017                )
        and                                         )
                                                    )
                                                    )
J.P. MORGAN ASSET MANAGEMENT                        )
HOLDINGS, INC.                                      )
Serve at:        270 Park Avenue                   )
                 New York, NY 10017                )
                                                    )
        and                                         )
                                                    )
                                                    )

7

J.P. MORGAN INVEST HOLDINGS, LLC )
f/k/a J.P. MORGAN INVEST, INC. )
<u>Serve at</u>:     270 Park Avenue )
            New York, NY 10017 )
 )
 )
      and )
 )
 )
David Embry )
<u>Serve at</u>:     1215 W. 57th Terrace )
            Kansas City, Missouri, 64113 )
 )
      and )
 )
Jennifer Mendicki O'Neill )
 )
<u>Serve at</u>:     4618 Warwick Road, #4D )
            Kansas City, Missouri, 64112 )
 )
 )
James E. Staley )
 )
<u>Serve at:</u>     270 Park Avenue )
            New York, NY 10017 )
 )
                DEFENDANTS. )

## PETITION

Plaintiffs allege as follows:

## INTRODUCTION

1.     This case arises from the false misrepresentations and willful misconduct by

J.P. Morgan Retirement Plan Services, LLC ("JPMRPS") and its agents, J.P. Morgan Chase &

Co. ("JPMC"), J.P. Morgan Asset Management Holdings, Inc. ("JPMAM"), J.P. Morgan Invest

8

Holdings, LLC, f/k/a J.P. Morgan Invest, Inc. ("JPMI"), J.P. Morgan Retirement Plan Services, LLC ("JPMRPS"), and the individual defendants, David Embry, Jennifer Mendicki O'Neill and James E. ("Jes") Staley, who were each officers or managers of JPMRPS or a controlling person of JPMRPS in a scheme by these defendants to unlawfully enrich JPMRPS, and its agents at the expense of the Plaintiffs. All defendants are hereinafter collectively referred to as "JPM", "JP Morgan" or, at times, "defendants".

     2.     The scheme to unjustly enrich JPM entailed the sale to the Plaintiffs of the stable value product, that JPM called "SAIF" (standing for "Stable Asset Investment Fund") and referred to herein as "SAIF", "JPM Stable Value Product" or "JPM Product". Defendants wrongly profited from the sale of the JPM Product by misrepresentations and willful, deceptive practices that induced Plaintiffs to purchase the JPM Product, while unbeknown to Plaintiffs, the hidden risks of the JPM Product belied the represented safety of the claimed superior yield performance, or investment return of SAIF.

     3.     Starting as early as 2005 (including specific meetings on March 19 and August 1, 2005) and continuing through the first half of 2008, in meetings and contacts led by JPMRPS, the defendants conspired and acted in concert to represent to Plaintiffs and the Plaintiffs' agents that the JPM Product would give superior return, superior market-to-book value and at the same time employed less risk than other stable value products, when in fact it contained riskier, lower quality mortgages and other debt instruments, and riskier private, self-rated mortgages with overstated market value. This disguised higher risk (taken in an attempt to gain a higher yield) caused the JPM Product to perform poorly during the financial downturn, generally the last quarter of 2008 through the present. JPM misrepresented the market value of asset-backed or mortgage-backed investments and the actual risk and the past performance of the JPM Product

9

sold to Plaintiffs. Further, JPM misrepresented that the JPM Product had the same attributes such as liquidity as other money market funds when, in fact, a sizable portion lacked liquidity.

4. Part of the scheme involved steering Plaintiffs' investment options away from safer and better-run stable value products, like the American Century Stable Value Product, for the purpose of getting Plaintiffs into the JPM Product from which JPM could earn multiple undisclosed fees.

5. By the scheme, JPMRPS itself profited by receiving monies equal to 50% of the management fee and by earning other substantial incentive credits—all for pushing SAIF over competing, superior stable value funds.

6. The allegations in this Petition are supported by findings of an arbitration panel that issued a $373 million award against JPMRPS on August 10, 2011 in connection with JPMRPS's promotion of the JPM Stable Value Product over the superior stable value product offered by American Century. Those findings were set out in a 72-page opinion of an independent panel consisting of a former judge and two AAA panel lawyer-arbitrators experienced in complex financial litigation. Each of the individual defendants were witnesses in that six week arbitration, which took place in February-March, 2011. As found by the arbitrators, individual defendants Embry and Mendicki O'Neill)"had their compensation impacted through bonus pool amounts...connected to the placement of JPMAM products and their personal employment positions informed by an understanding that sales and promotion of JPMAM products were more beneficial to their careers."

7. In meetings held just before the July 2006 transfer of over $30 million in Plaintiffs' monies to the JPM Product, defendants represented that the JPM Stable Value Product was, "your most conservative investment option." In many forums, including its website and in

multiple presentations, including presentations to Plaintiffs and to Plaintiffs' representatives, JPMRPS and its agents/co-defendants, misrepresented the JPM Stable Value Product as having less risk and higher yield than other stable value products.

8. JPMs' sales ploy was a ruse. While JPM touted the conservatism of its JPM Product, JPM in fact used its JPM Stable Value Product as a vehicle for placement of mortgages and other debt instruments having a higher risk (both liquidity and credit risks) and lower quality, hoping that by taking this hidden risk it could gain a higher yield.

9. JPM's misrepresentations led to Plaintiffs' investment in the JPM Stable Value Product during the financial crisis that centered on the years between 2008-2010. At all material times, while defendants sold the JPM Product as a stable value fund, defendants were in fact diverting a substantial portion of the assets of the JPM Product into unduly risky mortgage-backed assets that were in many cases, generated, priced and even self-rated by JPM.

10. JPM used the sales promise of an enhanced yield from its JPM Product (which it achieved by taking undisclosed and inappropriate risks, and by self-rating and valuing its "Private Mortgages") to build its sales of the JPM Product, thereby earning multiple layers of fees, some undisclosed, that benefitted defendants. In sum, JPM employed deceptive practices in order to gain millions of dollars in fees.

11. JPM knew, before the financial crisis, of the risks inherent in the JPM Product and thus to the safety of the JPM Product's yield versus other stable value products' yield. Defendants intentionally exposed Plaintiffs to future yield underperformance and liquidity constraints.

12. JPM and affiliated companies decided in October 2006 – shortly before the subprime storm hit Wall Street and Main Street alike with full force – to dump major portions of

11

their then considerable investment positions in low quality mortgage assets. JPM knew that SAIF contained low-quality mortgage assets, yet sold SAIF to Plaintiffs knowing that only others, either Plaintiffs or insurers of SAIF, bore the risk from the low-quality assets.

13. Starting in late 2006, JPM and affiliated companies had more than $12 billion of low-rated mortgage assets on JPM's "books". Thus at the same time that JPM and/or affiliated companies were selling their own positions in lower quality mortgages, similar low-rated and illiquid mortgage positions were placed in the JPM Stable Value Product, which was sold to Plaintiffs. While at the same time JPM was reducing its exposure to lower rated mortgage loans, it was marketing SAIF with this increased risk exposure to purchasers of its JPM Stable Value Product, which, by representation, was supposed to combine the safest, most conservative investment choice and a higher yielding fund than other stable value products.

14. While this ploy benefited defendants in the accumulation of billions of dollars into the JPM Product, from which it reaped profits, JPM harmed Plaintiffs and other purchasers of the JPM Product, who were stuck with the significantly declining yield on risky mortgages starting in 2008. These higher- risk mortgage positions explain why the JPM Product temporarily outperformed competitor stable value funds until the start of the financial crisis, then fell behind its competitor funds, return-wise, by a wide margin. This ploy was not happenstance. By attracting Plaintiffs' investment monies by promising higher yields, JPMRPS and its agents gained for themselves the earnings from the multiple fees charged for monies put into SAIF.

15. In November, 2008 and subsequent months, the JPM Product's market value fell to as low as the mid-80 percent. The average stable value fund at that time had market values in the mid-90 percent according to Hueler, an industry data reporting service.

12

16.     Through the aforementioned course of self-dealing, JPMRPS and its agents violated Missouri's Merchandise Practices Act and breached the duties set out in the counts presented below. These breaches have directly and proximately caused Plaintiffs to suffer significant financial harm. Damages to Plaintiffs have manifested themselves in, among other things, substantial diminution in their investment returns on the JPM Product. This action seeks to obtain relief from defendants' wrongful acts, including damages sustained by Plaintiffs and ill-begotten profits JPM got as a direct and proximate result of those acts.

17.     Defendants at all material times just before and during the financial crisis knew that a substantial portion of JPM's higher-risk mortgage and other assets, were being sold to Plaintiffs via touting SAIF as a "stable" and "conservative" investment product. Those moves were undertaken by defendants with an "eagle eye" to defendants' benefit and a callous indifference to the interests of Plaintiffs and other investors in the JPM Product.

18.     Defendants' willful and malicious misconduct has directly and proximately harmed Plaintiffs.

## PARTIES

19.     Plaintiffs are employees of Government Employees Health Assessment (GEHA) who purchased and invested in the JPM Stable Value Product (sometimes referred to by JPM as "SAIF"), during approximately 2008-2010.

20.     Plaintiffs do not assert any claims against fiduciaries as defined by ERISA and do not assert or allege an ERISA claim. None of the defendants exercise or exercised discretionary authority or control over management of the Plan or its assets. The alleged scheme is about deception and willful misconduct in the sale by JPMRPS and its agents of JPMRPS product services to Plaintiffs.

13

21.     JPMRPS is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business now located at the Sprint Campus on College Boulevard, Overland Park, Kansas. At the time of the acts alleged herein, JPMRPS was located on Ward Parkway in Jackson County, Missouri.

22.     JPMRPS has at all relevant times represented that it is not an ERISA fiduciary to its client Plans. In its April 1, 2001 agreement with the GEHA Plan Administrator, JPMRPS asserted that the "Plan Administrator is the fiduciary under the Plan". Further, in describing its services to the Plan, JPMRPS stated that it "shall be liable to the Plan or its Participants only for its negligent actions, negligent failure to act, or willful misconduct of itself or its agents, or as required by applicable law." By contract, JPMRPS sought to exclude ERISA liability.

23.     Further, in its renewed and updated agreement(s), JPMRPS agreed and asserted that its services did not require it to: "act as a fiduciary with respect to the Plan or to exercise any discretionary authority or discretionary control with respect to the. . . assets of the Plan" and that "its relationship" with the Plan Sponsor was "that of independent contractor."

24.     The SAIF is managed and controlled by an entity not a party to this case, the SAIF trustee JP Morgan Chase Bank, N.A. (Bank, N.A.). Bank, N.A. alone assumed the role of Trustee and ERISA fiduciary. In its Declaration of Trust, the Bank, N.A. declared:

> *Section 1.1.* **Title.** "The title of the trust fund hereby established shall be "Commingled Pension Trust Fund (Stable Asset Income) of JPMorgan Chase Bank, N.A." (formerly known as the Bank One Asset Income Fund)."

> *Section 1.2.* **Purpose.** "JPMorgan Chase Bank, N.A., a national banking association. . . is adopting this Declaration of Trust as successor trustee to the Bank One Trust Company, N.A. of the Bank One Stable Asset Income Fund. . . This commingled trust fund is established, operated and maintained by JPMorgan Chase Bank, N.A. <u>exclusively</u> as a medium for the collective investment

14

and reinvestment, without distinction between principal and income, of moneys or other assets of participating trusts."

*Section 1.3.***Definitions.** "...(d) The term "Trustee" shall mean JPMorgan Chase Bank, N.A. . .."

*Section 1.4.* **Effect of Declaration of Trust.** "The provisions of this Declaration of Trust, as the same may be amended from time to time, shall control all participations in the Commingled fund and the rights and benefits of all persons interested in such participations as beneficiaries or otherwise. "

*Section 4.1.* **Title, Custody and Location Investments.** "The ownership of all of the assets in the Commingled fund shall be vested solely in the Bank as Trustee and shall be considered as assets held by it as Trustee."

*Section 4.3.* **Additional Investment Provisions.** ". . . the Trustee shall have the power to: (1) invest and reinvest any moneys at any time forming any part of the Commingled fund in any property. . .

Trustee shall invest the assets of the Commingled Fund in a manner consistent with the provisions of ERISA. . .(e) The decision of the Trustee as to whether or not an investment is of a type which may be purchased for the Commingled Fund shall be conclusive."

*Section 4.4.* **Additional Powers of the Trustee.** ". . . (g) to cause or authorize any investments from time to time held by it to be registered in, or transferred into its name as Trustee, or the name of its nominee, or in the name of any other nominee, or to retain them unregistered or in form permitting transferability by delivery; and to deposit any such investments in or with any depositary, sub-custodian, clearing corporation, or any central system for handling of investments, or any nominee thereof; but the books and records of the Trustee shall at all times show such investments are part of the Commingled fund;. . ."

15

*Section 5.1.* **Division into Units.** "The Commingled Fund shall be divided into units and the proportionate interest of each participant shall be evidenced by the number of units and fractions of a unit allocated to it based upon the amount of the moneys of such participant paid into the Commingled fund. The original value of each unit of participation shall be determined by the Trustee. . ."

*Section 6.1.* **Frequency of Valuation.** ". . .the Trustee shall determine the value of the Commingled Fund and the units thereof in the manner prescribed in this Declaration of Trust. . ."

*Section 8.1.* **Participation Records.** "Records shall be maintained for the Commingled Fund which shall show with respect to each participant:

    (a) The date of each admission to the Commingled Fund, the number of units allotted and the amount paid therefor;

    (b) The date of each withdrawal, the number of units redeemed, the amount paid on redemption to the participant and whether payment was made in cash, in kind or partly in cash and partly in kind:. . ."

**ARTICLE IX. MANAGEMENT FEES AND EXPENSES.** **Commingled Fund-Institutional Class:** ". . . The Trustee shall charge a management fee directly against the Commingled Fund-Service Class in the amount of 45 basis points (0.45%)

**ARTICLE XIII. ACCEPTANCE OF TRUST AND TRUST FUND.** "JPMorgan Chase Bank, N.A. by execution of this Declaration of Trust hereby signifies its acceptance of the trust and trust fund created hereunder and acknowledges that as Trustee it is a fiduciary with respect to each participating trust which is an employee benefit plan subject to ERISA."

25.    JPMI, a corporation, is organized and existing under the laws of the State of Delaware, and has its place of business at 270 Park Avenue, New York, New York. Upon information and belief, JPMI is an affiliate of JPMRPS and sits above JPMRPS in the corporate structure.

16

26.     Upon information and belief, JPMAM, sits above JPMI and JPMRPS in the JPM organizational structure. JPMAM is a Delaware corporation with its principal place of business at 270 Park Avenue, New York, New York 10017. JPMAM is an affiliate company to JPMRPS and is in the asset management business within the global financial services firm often referred to as JP Morgan Chase & Co. JPMAM holds trillions of dollars in assets under supervision.

27.     The ultimate parent of each corporate defendant is JPMorgan Chase & Co. ("JPMC"), the nation's largest bank based on market capitalization. JPMC is a component of the Dow Jones Industrial Average and serves millions of consumers in the United States. It has over 200 subsidiary companies including the defendant affiliates named in this suit. All JP Morgan entities report consolidated earnings or profits through JPMC. One purpose of the scheme alleged is the channeling of profits for accumulating monies in the JPM Stable Value Product ultimately to JPMC but reflected in largest part as "profits" or revenues on JPMRPS's books. JPMC's liability, in part, is based on respondeat superior principles. Its stock is sold and traded under the symbol "JPM."

28.     David Embry was the Senior Vice President of JPMRPS in charge of marketing and sales during the time of the sale of the JPM Product to Plaintiffs. He was a major participant in and had control of the scheme set out in this Petition. He is a Missouri resident who resides near Ward Parkway in Kansas City, Missouri. He and defendant O'Neill profited from the sale of the JPM Product through bonuses and other additional compensation. In addition, JPMRPS and JPMAM profited by pushing and selling the riskier JPM Product to Plaintiffs.

17

29.     Jennifer Mendicki O'Neill is a Strategic Relations Manager who resides in Jackson County, Kansas City, Missouri. She earned bonuses and other compensation from the sale of the JPM Stable Value Product over less risky stable value products sold by American Century and other institutions and was a participant in the scheme set out herein.

30.     James E. Staley, an individual, is a New York resident. He held officer positions in various JP Morgan entities. At times relevant to the claims asserted herein, he was the CEO of JPMAM, which is the JPMC entity that sits atop JPMC's asset and wealth management business. Mr. Staley was also a managing director of JPMC and served on the Executive Committee of JPMC. The JP Morgan entities named as defendants are controlled and directed through common or interlocking directors or officers, including particularly the defendants Staley and Embry. Staley directly orchestrated the purchase of JPMRPS in 2003 from a Missouri company, American Century, and held ultimate decision- making authority over and directly participated in the activities alleged herein including ordering and/or approving the acts that induced Plaintiffs' purchases of the JPM Stable Value Product. During the same time period of JPM's wrongful sales scheme (which include specific meetings on March 19 and August 1, 2005 and other meetings in 2006 prior to Plaintiffs' "mapping" of over $30 million to SAIF), Staley was presented with direct evidence of the higher risks inherent in SAIF and, in spite of that knowledge, he permitted, promoted and directed the continued wrongful advertising, marketing and sale of the JPM Stable Value Product through JPMRPS's direct contacts with Plaintiffs and Plaintiffs' representatives. Staley pushed for inclusion of JP Morgan proprietary products, like the JPM Stable Value Product, to the exclusion of better performing funds or funds charging less fees to investors. His motive was to increase JPM profits at the expense of Plaintiffs. Staley's conduct in this regard was recently reported in July 2 and 3, 2012 media

18

articles, including in the <u>NY Times</u>, and such conduct was recently described in a 72 page Arbitration Award of $373 million against JPM, which this Court has previously affirmed and upon which this Court has entered judgment.

31.     For the purpose of the acts alleged herein, the corporate defendants are alter egos of JPMRPS and operate as a single entity and instrument to achieve profit goals and to commit the wrongful acts alleged herein. Further, the defendants Staley, Embry and O'Neill conspired with, acquiesced in, participated in and/or directed the inequitable and tortious acts and the violations of Missouri statute and common law set out in this Petition. For purpose of this Petition and because of the alter ego and interlocking agency relationship with JPMRPS, all references herein to "JPM" or to "JP Morgan" are inclusive of and by definition include all defendants.

32.     While JPMRPS and the other corporate defendants may technically exist as separate corporations, the individual defendants controlled, oversaw, and executed the policies and the scheme conducted by JPMRPS and its agents.

33.     Plaintiffs' are informed and believe, and therefore allege, that at all relevant times each of the individual were acting within the course and scope of employment and with the ratification and approval of JPMRPS.

34.     Defendants are individually sued as participants, agents and as aiders and abettors in the improper acts, plans and schemes by JPMRPS to advertise, market, and sell the JPM Stable Value Product to Missouri residents.

35.     Missouri law, as invoked in the causes of action asserted herein, provides relief to Plaintiffs in a manner not impinging upon or duplicative of any federal law or regulation.

36. Defendants have participated as conspirators in furtherance of JPMRPS' willful misconduct set forth herein or have acted with or in furtherance of such scheme in carrying out their purposes as alleged in this Petition, and have performed and continue to perform unlawful acts and made false and misleading statements in Missouri in furtherance of their violations of Missouri law as alleged herein.

## JURISDICTION AND VENUE

37. The Court has personal jurisdiction over each defendant because the causes of action asserted herein arise out of the defendants' commission of tortious and inequitable acts, and breaches of statutory duties, all of which occurred in, were directed at, and/or caused injury and damage to the Plaintiffs in Jackson County, Missouri.

38. The Court also has personal jurisdiction over each defendant because each defendant is subject to general and specific jurisdiction in the State of Missouri and/or resides in Missouri.

39. Venue is proper in this Court because Plaintiffs were first injured and continue to be injured in Jackson County, Missouri, by defendants' commission of tortious acts and breaches of contract in Jackson County, Missouri and because Plaintiffs are located in Jackson County, Missouri and defendants JPMRPS, Embry and Mendicki O'Neill were located in Jackson County, Missouri at the time of the acts of breach and the tortious acts alleged herein.

40. All of the claims in this action arose from events or occurrence that occurred in the State of Missouri, and those events and occurrences caused injuries in the State of Missouri.

## MARKETING AND SALE OF JPMORGAN STABLE VALUE PRODUCT

20

41.     At all times relevant to this Petition, Bank, N.A. unilaterally calculated the JPM Product's Net Asset Value ("NAV") or private market price of SAIF.

42.     The NAV's unit price was quoted privately to Plaintiffs by JPMRPS and/or its agents—not in an active market. JPM caused Plaintiffs to purchase the product at the artificial value calculated- a value that was in excess of its true "market-to-market" value, thereby damaging Plaintiffs at time of purchase and thereafter.

43.     The investment product sold by defendants and purchased by Plaintiffs is a pooled stable value product, meaning JPM sold this product to others who "pooled" their money into one investment product.

44.     JPM touted the JPM Stable Value Product as offering the utmost in safety and liquidity while beating the returns of other stable value funds and money market funds, and as invested in "investment grade" fixed income securities. A stable value fund, by common definition, invests in high-quality, liquid, diversified, fixed-income debt and is designed to preserve the capital of those who buy the product while providing steady, positive above-money-market rates of return. JPM misrepresented that the liquidity of the JPM Stable Value Product was the same as money market fund.

45.     Defendants marketed and sold the JPM Product as a typical stable value fund. In their marketing materials, defendants described the product as, "seeking to preserve the value of money invested," and "perform[ing] better than the average money market fund, and earn[ing] consistent, reliable returns". Defendants represented the product to be invested in "high quality fixed income portfolio," and stated that "the fixed income portfolio consists of investment grade fixed income securities". Defendants touted "SAIF" as providing superior returns to competing

21

stable value products. These misrepresentations were made on the website "Fact Sheets" and at meetings with the Plaintiffs and Plaintiffs' representatives.

46.     Defendants emphasized that the JPM Product was a typical stable value fund, not only by calling it "Stable Value," "SAIF" or a "Stable Asset" Fund, but also by their characterization of the risk level of the JPM Product. On a scale of 1-5, with 1 being the most conservative and 5 being the most aggressive, defendants consistently stated that the JPM Product was a 1 (most conservative). JPM stated publicly that the JPM Product is among the "most conservative" investments possible.

### Performance of the JPM Stable Value Product

47.     JPM touted SAIF's results as outperforming its competitors. Defendants drew investors to the JPM Product by emphasizing this artificial, temporary, above-market performance (compared to other stable value funds) never disclosing that it gained performance by taking higher risk. For example, just before the financial crisis, the JPM Product reported returns in 2006 over 5%. At no time did JPM disclose that the SAIF used higher risk collateralized or asset backed instruments and utilized self-rated and self-valued investments in its JPM Product as a means of accomplishing those returns.

48.     JPM's scheme involved specific misrepresentations to Plaintiffs' agents and Plan fiduciaries in meetings just before the July, 2006 transfer of over $30 million by Plaintiffs to SAIF.

49.     At times in this period and in specific meetings discussed above, JPM touted SAIF's book-value return performance as consistently above the Citigroup 3-month Treasury Bill Index and other indexes, which defendants held out as relevant benchmarks. However, the Citigroup 3-month Treasury Bill Index is comprised entirely of liquid, high-quality, investment

22

grade securities. JPM did not disclose that SAIF self-valued certain investments to rig the reported book and market values of the JPM Product.

50. From 2008-2010, the JPM Product's performance changed dramatically as the financial downturn revealed the true nature of the JPM Product's investments. Thus, competitor stable value funds and the industry benchmarks markedly outperformed the JPM Product. JPM's Product trailed its peers for each year since 2008 according to Hueler. Over this period, the JPM Product's investment yields dropped precipitously. At the same time, the JPM Product's benchmarks greatly exceeded the JPM Product's yield, and competitors' stable value funds were consistently yielding higher annual returns. Had the JPM Product not been invested in unduly risky mortgage debt– and had it not paid significant undisclosed fees to defendants for those inappropriate investments – the JPM Product's yielded returns in 2008 to date would have been substantially higher.

51. For the years 2008 to date, the losses to Plaintiffs from the reduction in yielded returns of the JPM Product caused by JPM's wrongful conduct are estimated, prior to receiving JPM's data, to exceed $1 million. This underperformance relative to true stable value funds accretes daily as Plaintiffs have lost compounding effects, and because JPM "gated" the JPM Product, meaning certain restrictions were put in place that barred, deterred, or inhibited Plaintiffs or their employer plan administrator, from removing their assets from the JPM Product and going to stable value funds or other investment products with higher yields.

### JPM Exposed Plaintiffs to Risky Assets

52. Leading up to 2008 (and even afterwards), defendants stated (including web site "Fact Sheet" postings) that the JPM Product's portfolio of investments consisted of investment grade, fixed-income securities, primarily U.S. Treasury, agency, corporate, mortgage-backed,

23

asset-backed, and privately placed mortgage debt, and that the JPM Product's risk was less than other stable value funds and other low risk investments products. Specifically, in the meetings, prior to July, 2006 set up with Plaintiffs' representatives, JPM made these precise misrepresentations to the Plaintiffs and Plaintiffs' representatives. These representations were untrue when made and defendants knew they were untrue.

53. Contrary to its sales materials and representations given to Plaintiffs and Plaintiffs' representatives in the identified March 19 and August 1, 2005 meetings and in the first half of 2006, defendants caused the JPM Product to purchase proprietary mortgage assets JPM originated through a fund called the Mortgage Private Placement Fund ("MPPF") and that it called "Private Mortgages." In fact, during 2008 and 2009, as much as 15- 20% of all JPM Product's assets consisted of Private Mortgages originated within JPM. Along the way, JPM extracted multiple fees, beginning with the undisclosed fees from its own origination of the Private Mortgages placed within the MPPF, to undisclosed fees from the "replacement" of these mortgages into collective funds, and the fees embedded in the "Intermediate Bond Fund" placed within the JPM Stable value product.

54. The MPPF issued its own commercial loans for which it received various origination and loan fees. Then, SAIF tacked on yet an additional "management fee", charging Plaintiffs for all the fees taken, while only the last management fee was disclosed.

55. Defendants falsely advertised and sold SAIF as having lower fees than other stable value funds (or at least commensurate fees) when in fact when the undisclosed fees are considered, SAIF's fees were much higher than competing, less risky stable value funds.

56. Plaintiffs thereby became invested in "Private Mortgages" through a multistep scheme. The upshot is that defendants surreptitiously buried their fees from their origination of

24

JPM's Private Mortgages and other investments through a series of investments in JPM's Intermediate Bond Fund that were eventually held by the JPM Stable Value Product.

57. Defendants adopted a self-dealing, fee-layering scheme, and concealed these strategies to gain multiple levels of fee extractions. Defendants took Plaintiffs' monies from the sale of the JPM Product and invested these monies in as many as five layers of other JPM-sponsored funds, including the JPM Intermediate Bond Fund. JPM utilized the JPM Intermediate Bond Fund to invest in JPM-originated or purchased Private Mortgages and other JPM Products.

58. This fee-generating, fund-layering strategy allowed defendants not only to mask the magnitude of the JPM Product's exposure to risky investments, but also to profit from layers of undisclosed fees and expenses generated by investment in each of the many layers of the funds in question. In some cases, JPM captured fees for a fund multiple times by investing in it more than once. In some cases, such as securitized packages of auto loans, those asset back securities were actually issued by JPM affiliates.

## SAIF NOT "INVESTMENT GRADE"

59. Neither the JPM Product's Private Mortgages nor many of its asset backed securities embedded in the JPM Product were "investment grade." Nor were the Private Mortgages rated by a third-party credit-rating agency, which would have produced an objective credit rating for such mortgages.

60. SAIF created its own credit ratings and market values for the Private Mortgages and other unrated securities.

61. Only SAIF utilized Private Mortgages– all other stable value funds avoided placing this kind of illiquid, non-third party rated debt in a product defined as "conservative".

62. JPM touted to Plaintiffs and Plaintiffs' representatives that its Investment Guidelines for SAIF prohibited the purchase of issues rated below investment grade. It posted

25

this misrepresentation in "Fact Sheets" on its website. By self-rating its own Private Mortgage, JPM surreptitiously never appeared to be violating what it represented to Plaintiffs and Plaintiffs' representatives.

63. The Private Mortgages in the MPPF and SAIF has not been marked-to-market at the time defendants sold SAIF to Plaintiffs.

## Defendants' Caused Substantial Damages to Plaintiffs

64. Higher (i.e. lower rated) risk and illiquid assets (such as, among others, JPM Private Mortgages) were unsuitable for a stable value fund, and JPM recognized the inappropriate nature of this asset class before the financial crisis. Even in early 2007, while JPM was well aware that the lower-rated mortgage-based securities derived from housing mortgages were about to collapse, it continued to sell Plaintiffs these undisclosed, lower-rated and unrated mortgage products of various sorts into the JPM Stable Value Product sold to Plaintiffs. This was done to quickly grow the assets in SAIF through the promised higher yield and misrepresented lower risk which meant profits to JPM, as SAIF was a proprietary product. If JPM had touted and sold a conservative fund from a third-party, the American Century fund, for example, JPM would not get credit for all the fees—American Century would in large part get that fee. In doing so, defendants thus looked to benefit themselves while exposing risk and eventual injury to the Plaintiffs.

65. The JPM Product invested as much as 40 percent of assets in below-investment grade or illiquid assets not suitable for a stable value fund. Moreover, as discussed above, defendants concealed this by, among other improper conduct, "self-rating" their private mortgages and misrepresenting the actual risk. At times, defendants brazenly and falsely touted

26

the JPM Product as "safer" than riskless assets. This was presented in "standard deviation charts" used in 2005-2006 and widely distributed to clients of JPMRPS in order to sell the SAIF product.

66.     In the end, defendants' unlawful scheme caused Plaintiffs to pay too much – both in the purchase prices that was above the true market value and in fees. This led to diminished returns or lower yields in the JPM Product from 2008 to date.

67.     The JPM Product's Private Mortgages suffered a substantial loss of value, and the JPM Product began—post 2008—to write down the market value and related prices for the Private Mortgages and for other investment assets. This caused the JPM Product's annual yield to Plaintiffs, especially relative to competitor stable value funds, to fall. In an effort to conceal its unlawful acts, defendants have adopted the excuse of blaming the JPM Product's lower returns on other factors, when in actuality the lower returns were due to the self-dealing schemes and JPM's misrepresentations used to induce Plaintiffs to purchase the JPM Product. The JPM Product underperformed its peers.

68.     The annual returns on the JPM Product have been far less than they should have been if only assets of the represented quality and liquidity had been placed into the JPM Product.

69.     Moreover, the JPM Product began using crediting rates set by negotiation and monthly yields, rather than by the formulas required by the wrap (insurance) contracts. Those formulas were in place to protect investors in the JPM Product. If defendants had disclosed the actual conditions under which the crediting rated (yield) was being set, Plaintiffs (and others) would have been aware earlier of the real losses in the JPM Product due to Private Mortgages and other improper investments. But they were not.

70.     Furthermore, defendants intentionally omitted important accounting details about the JPM Product's investments and otherwise failed to fully advise Plaintiffs and other investors

27

in the JPM Product of market value losses related to the Private Mortgage. By not marking the Private Mortgages to market, Plaintiffs concealed from them the losses they had caused or would eventually cause to the yield on the JPM Product.

71.     Defendants gained at least two advantages from the alleged wrongful conduct: First, there was a quick build-up the problematic assets in SAIF (a small fund originally acquired in its 2005 purchase of Bank One). By pushing its own proprietary, Stable Value Fund, defendants earned bonuses and profits not available to them if they sold non-proprietary products. Second, because JPM entities were involved in multiple levels of the transactions used to create the JPM Intermediate Bond Fund sold to SAIF, JPM could and did receive substantial undisclosed fees from the Intermediate Bond Fund and assets it purchased or brought into that underlying Fund.

72.     Defendants were well aware that the actions complained of herein – both prior to and during the 2008 through 2010 period – were improper. JPM sought to keep from the public its scheme. The chief investment officer tagged with responsibility for the improper investments and poor performance was terminated. Agreements with "wrap" insurers were struck to not reveal to the public the issues with the JPM Product.

73.     Because of JPM's self-dealing in fees, Plaintiffs overpaid for purchasing (*i.e.* entering and remaining in the JPM Product) and starting in 2008 received a lower rate of return than the JPM Product would have yielded if it had been, as represented, a true stable value fund. There is a direct relationship between the losses to Plaintiffs and defendants' unlawful conduct, which proximately caused the Plaintiffs' injuries.

### FIRST CAUSE OF ACTION
**(For Violations of Missouri's Merchandising Practices Act,**
**Mo. Rev. Stat. §407.010, *et. seq*)**

28

74. Plaintiffs hereby incorporate by reference and re-allege all paragraphs previously alleged herein into all counts including this count. Plaintiffs assert the cause of action against all defendants.

75. Missouri's Merchants Practice Act, Mo. Rev. Stat. § 407.010, *et seq.* substantially regulates the relationship and wrongful activities set out in this Petition.

76. Plaintiffs and defendants are "persons" within the meaning of section 407.010(5).

77. Defendants' activities, marketing, and services constitute the sale of "merchandise" within the meaning of section 407.010(4).

78. Beginning in October, 2008, Plaintiffs by their continued investments and by new purchases, purchased the JPM Product and paid the fees for JPM services.

79. As set forth herein, defendants' acts, practices and conduct violate section 407.020(1) of Missouri's Merchandising Practices Act in that, among other things, defendants used and/or continue to use deception, misrepresentation, unfair practices, concealment, suppression and/or omission of material facts in connection with the advertising, marketing, and offering for sale of the JPM Stable Value Product.

80. Defendants' unfair and deceptive acts, practices, and conduct include concealing fees it earned and failing to disclose material facts about the monies defendants' obtained from selling the JPM Stable Value Product to Plaintiffs.

81. Defendants have also deceptively and unfairly charged loan origination and other fees to Plaintiffs.

82. Defendants' conduct violates the Missouri's Merchandising Practices Act pursuant to state regulations 15 C.S.R. § 60-8 because their conduct: (1) offends public policy;

29

(2) is unethical, oppressive, and unscrupulous; (3) causes substantial injury to consumers; (4) was not in good faith; (5) is unfair because Defendants' charged consumers for services which the customer had not ordered or solicited; and (6) is unconscionable.

83. Defendants' acts were undertaken with malice and callous indifference to the interests of the Plaintiffs, thereby subjecting defendants to an award of punitive damages.

84. Plaintiffs seek actual damages; a declaration that defendants' methods, acts, and practices violate the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et seq.*; disgorgement of all profits or revenues (fees) obtained from defendants' scheme; pre-and post-judgment interest; punitive damages; attorneys' fees, litigation expenses and costs; and any and all other relief that the Court deems just and proper.

**SECOND CLAUSE OF ACTION**
**(Money Had and Received)**

85. Plaintiffs hereby incorporate by reference and re-allege all paragraphs previously alleged herein.

86. Defendants have been enriched by the money they made in connection with the profits, credits, layered fees and bonuses obtained from selling the JPM Stable Value Product.

87. Defendants obtained this money through wrongful, unfair and deceptive practices.

88. Defendants fail or failed to provide fair consideration to Plaintiffs in exchange for the fees obtained.

89. Defendants' acts were undertaken with malice and callous indifference to the interests and rights of Plaintiffs, thereby subjecting defendants to an award of punitive damages.

90. Equity and good conscience require restitution to Plaintiffs. Plaintiffs have been wrongfully deprived of their money and are entitled to its restoration, along with interest thereon

30

from the date the money was taken by defendants to the date of judgment and Plaintiffs are entitled to disgorgement of money received from the multiple fees JPM gained by its scheme together with prejudgment interest on all amounts rewarded, punitive damages, attorneys' fees, expenses and costs, and any other relief the Court deems necessary and proper.

## THIRD CAUSE OF ACTION
### (For Unjust Enrichment)

91.    Plaintiffs hereby incorporate by reference and re-allege all paragraphs previously alleged herein.

92.    Defendants have received and continue to receive benefits (profits, bonuses, credits and fees) at the expense of Plaintiffs and it is inequitable for defendants to retain these benefits.

93.    Through their ultimate payment of the multiple fees, Plaintiffs have conferred monetary benefit on defendants and defendants have unjustly profited from that monetary benefit. Plaintiffs have not received any corresponding benefit.

94.    Defendants have accepted and retained the benefits unfairly conferred upon them to the detriment of Plaintiffs.

95.    Defendants' actions were undertaken with malice and callous indifference to the interests of Plaintiffs, thereby subjecting defendants to an award of punitive damages.

96.    As a direct and proximate result of defendants' unlawful acts and practices, Plaintiffs have been wrongfully deprived of their money and are entitled to its restoration, along with interest thereon from the date the money was taken by the defendants to the date of judgment, JPMS has been unduly and inequitably enriched and is not entitled to keep the fruits of its unjust scheme, all these monies should be awarded plaintiffs along with prejudgment

31

interest, punitive damages as well as attorneys' fees, expenses and costs, corrective notice, and any other relief the court deems necessary and proper.

## FOURTH CAUSE OF ACTION
### (For Fraud)

97. Plaintiffs hereby incorporate by reference and re-allege all paragraphs previously alleged herein.

98. Defendants represented the JPM Stable Value Product was a conservative investment option, having both superior performance and less risk than other stable value products, that it was invested in investment grade fixed-income securities, that it was invested in a high-quality fixed income portfolio, that it was the most conservative of investments and that it was safer than US Treasuries, and defendants failed to disclose that the JPM Stable Value Product contained low quality and high risk investments, many of which were originated or previously held by JPM, for which JPM received multiple excessive and undisclosed fees.

99. Defendants had a duty to make full and accurate representations to Plaintiffs and to disclose all relevant and material facts about the JPM Product.

100. Defendants representations were false in that the assets and JPM Private Mortgages placed into the JPM Stable Value Product were inappropriate for a stable value product, were not investment grade fixed income securities, were not high-quality, were not the most conservative of investments, were not safer than US Treasuries and violated the credit rating and investment guidelines for the JPM Product.

101. Defendants knew the representations were material and were false when made and knew their failures to disclose would be material to Plaintiffs' decision to purchase and remain invested in the JPM Product.

32

102. Plaintiffs relied on defendants' false representations and omissions in deciding to purchase and remain invested in the JPM Product.

103. Defendants acts and omissions were undertaken with malice and callous indifference to the interests of Plaintiffs, thereby subjecting defendants to an award of punitive damages.

104. Defendants' conduct constitutes fraud and Plaintiffs seek actual damages, pre- and post-judgment interest, punitive damages, attorneys' fees and costs and any and all other relief that the Court deems just and proper.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs requests judgment and relief on all causes of action as follows:

A.    For an order declaring that defendants have violated the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et seq.*;

B.    For an order directing defendants to disgorge all fees obtained from their unfair and deceptive practices; including the monies JPM got from their management fee in SAIF and from the multi-layering of fees enabled by Plaintiffs' purchases of the JPM Stable Value Product.

C.    For an order awarding Plaintiffs' damages in an amount to be proven at trial, together with pre-trial and post-trial interest thereon;

D.    An award of punitive charges against each defendant.

E.    For an order awarding Plaintiffs' attorneys' fees, litigation expenses, and costs of suit; and

33

F. For an order awarding such other and further relief as this Court deems just and proper.

## JURY DEMAND

WHEREFORE Plaintiffs' hereby demand a trial by jury on all issues that are triable to a jury.

Dated: September 12, 2012

Respectfully submitted,

**ROUSE HENDRICKS GERMAN MAY PC**

Randall E. Hendricks   MO #24832
Lawrence A. Rouse MO #25064
1201 Walnut, Suite 2000
Kansas City, MO 64106
Telephone:  816-471-7700
Facsimile: 816-471-0794

**COUNSEL FOR PLAINTIFFS**

34

# IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI, AT INDEPENDENCE
## SIXTEENTH JUDICIAL CIRCUIT OF MISSOURI
### (INDEPENDENCE)

Stahr D. Ashurst )
1609 S. Whitney Dr. )
Independence, MO 64057 )
)
Valerie Arrocha )
3744 Elmwood )
Kansas City, MO 64128 )
)
LeAnn M. Belew )
521 SW Moore )
Blue Springs, MO 64014 )
)
Linda Sue Beltz )    CASE NO. 1216-CV23784
2601 S. Milton Dr. )
Independence, MO 64055 )    DIVISION 16 (Judge Roldan)
)
Brandy Blackmon )
2617 N. Twyman Rd )
Independence, MO 64058 )
)
Lori Boniedot )
1331 S. Randall Rd. )
Independence, MO 64055 )
)
Sheila R. Brock )
2848 SW Carlton Dr. )
Lee's Summit, MO 64082 )
)
Kathleen Burmeister )
511 SE 19th St. )
Oak Grove, MO 64075 )
)
Jeanetta Cobb )
3605 NW Hidden Pointe Dr. )
Blue Spring, MO 64015 )
)
Kathy Cox )
405 N. Cochise Dr. )
Independence, MO 64056 )
)
Heather D. Craft )
1427 ½ South Sterling Ave. )

JMD

FILED-CIRCUIT COURT,
JACKSON CO. MO-1
2012 SEP 20 PM 3:28

1

Independence, MO 64052                          )
                                                )
Brenda S. Dannaldson                            )
829 N. Ponca Dr.                                )
Independence, MO 64056                          )
                                                )
Cicilyn Davis                                   )
4906 Wallace Ave.                               )
Kansas City, MO 64129                           )
                                                )
Terri Davis                                     )
17917 S. Hilltop Rd.                            )
Pleasant Hill, MO 64080                         )
                                                )
Shirley Dieckhoff                               )
721 N. Sioux Ave.                               )
Independence, MO 64056                          )
                                                )
Gayla Dowell                                    )
16921 York Ave.                                 )
Independence, MO 64055                          )
                                                )
Heather Downey                                  )
3572 NE Austin                                  )
Lee's Summit, MO 64064                          )
                                                )
Wilma J. Ebert                                  )
950 S. State Route 7                            )
Independence, MO 64056                          )
                                                )
Karen Euritt                                    )
26307 E. Blue Mills Rd.                         )
Sibley, MO 64088                                )
                                                )
Margaret A. Evans                               )
10216 E. 96th St.                               )
Kansas City, MO 64134                           )
                                                )
Sara Ferguson                                   )
2905 NW 4th St. Terr.                           )
Blue Springs, MO 64014                          )
                                                )
Cathleen R. Frantz                              )
707 W. Hwy 224                                  )
Wellington, MO 64097                            )
                                                )

2

Lynn Frentrop                                    )
1213 NE 82nd Terr.                               )
Independence, MO 64118                           )
                                                 )
Charlene Fitzhugh                                )
8708 E. 92nd Pl.                                 )
Kansas City, MO 64138                            )
                                                 )
Kimberly Foudree                                 )
4424 NE Shadow Valley Cir.                       )
Lee's Summit, MO 64064                           )
                                                 )
Emily Galloway                                   )
3613 Lake Shore Dr.                              )
Blue Springs, MO 64014                           )
                                                 )
Sharon Grammer                                   )
2017 N. Ponca Dr.                                )
Independence, MO 64058                           )
                                                 )
Linda Green                                      )
6515 NW Quail Run Dr.                            )
Parkville, MO 64152                              )
                                                 )
Lynn Green                                       )
1410 E. Salem Ln.                                )
Olathe, KS 66062                                 )
                                                 )
Patricia Hake                                    )
304 NE Forest Ave., Apt. C                       )
Lee's Summit, MO 64063                           )
                                                 )
Kayla Hale                                       )
526 El Lago Circle                               )
Climax Springs, MO 64324                         )
                                                 )
Minnie Henson                                    )
12206 E. 56th Terrace                            )
Kansas City, MO 64133                            )
                                                 )
Myrle Hill                                       )
5279 Spruce                                      )
Kansas City, MO 64130                            )
                                                 )
Janice Hohenburg                                 )
16612 E. Gudgell, Apt. D                         )

3

Independence, MO 64055           )
)

Deborah Hopkins              )
19202 E. 28th St. S.          )
Independence, MO 64057       )
)

Vicki Hopkins                )
27606 Rogers Rd.           )
Buckner, MO 64016         )
)

Lynn Huff                   )
3611 S. Bolger Ct.          )
Independence, MO 64055       )
)

Melanie Jefferson           )
1405 E. 66th St.            )
Kansas City, MO 64131        )
)

Soteria Jenkins              )
2514 N. Six Mile Church Rd.   )
Independence, MO 64058       )
)

Cynthia Jones               )
3337 Askew               )
Kansas City, MO 64128        )
)

Robert Kordalski            )
17925 Mission Rd.          )
Stillwell, KS 66085          )
)

Tamara Liber                )
19703 NE 197th Terr.        )
Smithville, MO 64089        )
)

Paula Luna                 )
200 S. Shrank Ave.         )
Independence, MO 64056       )
)

Pamala McGee             )
1900 N. Concord Rd.        )
Independence, MO 64058       )
)

Leona McGinnis           )
16414 E. Cogan Rd.        )
Independence, MO 64055       )
)

4

Michael McMurray )
506 Deer Ln. )
Pleasant Hill, MO 64080 )
)
Saundra McRae )
34609 Pink Hill Rd. )
Grain Valley, MO 64029 )
)
Cecil Morris )
3813 SW Windmere Dr. )
Lee's Summit, MO 64082 )
)
Sandra Oertwig )
E. 20th St. S. )
Independence, MO 64050 )
)
Tamara O'Hare )
5401 S. Harding St. )
Oak Grove, MO 64075 )
)
Sheri Orr-Davidson )
17676 N. Union Rd. )
Lawson, MO 64062 )
)
Jo Parker )
6414 Ridgeway Ave. )
Kansas City, MO 64133 )
)
Diane Postlethwait )
3603 S. Drumm Ave. )
Independence, MO 64055 )
)
Bernice Pryor )
1801 E. 97th Terr. )
Kansas City, MO 64131 )
)
Linda Rohaus )
1124 SW Eastman St. )
Blue Springs, MO 64015 )
)
Connie Schmidt )
18004 E. 18th St. N. )
Independence, MO 64058 )
)
Beatrix Schmitt )
5702 N. Norton Pl. )

5

Gladstone, MO 64119                          )
                                             )
Shirley Scott                                )
19400 E. 37th Terr. Ct. S. Apt. 316          )
Independence, MO 64057                        )
                                             )
Peggy Smith                                  )
12016 Markham Rd.                            )
Independence, MO 64052                        )
                                             )
Troy Spencer                                 )
14350 W. 187th Terr.                          )
Olathe, KS 66062                             )
                                             )
Carolyn Thomas                               )
1903 E. 16th                                 )
Kansas City, MO 64127                         )
                                             )
Deborah P. Thomas                            )
4020 Lawn Ave.                               )
Kansas City, MO 64130                         )
                                             )
Shanna Thompson                              )
31 NW 102nd St.                              )
Kansas City, MO 64155                         )
                                             )
Paris Valleau                                )
11623 E. 85th St.                            )
Raytown, MO 64138                             )
                                             )
Virginia Wanamaker                           )
1712 Ashley Dr.                              )
Independence, MO 64058                        )
                                             )
Joyce Webb                                   )
7500 E 108th St.                             )
Kansas City, MO 64134                         )
                                             )
Cynthia White                                )
1300 Cottonwood Dr.                          )
Greenwood, MO 64034                           )
                                             )
Teresa White                                 )
4009 S. Maybrook Ave.                        )
Independence, MO 64055                        )
                                             )

6

Chandra Williams )
503 Palomino Ln. )
Ogden, KS 66517 )
)
)
Eavy Wilson )
8526 Bruns Rd. )
Richmond, MO 64085 )
)
)
Sheila Wittmeyer )
36 Anchor Dr. )
Lake Tapawingo, MO 64015 )
)
)
Vicky Wooten )
503 SE 19th St. )
Oak Grove, MO 64075 )
)
)
Carolyn Woods )
523 S. Cedar Ave. )
Independence, MO 64053 )
)
)
)
)
)
PLAINTIFFS, )
)
)
vs. )
)
)
J.P. MORGAN RETIREMENT PLAN )
SERVICES, LLC, )
Serve at: 6580 Sprint Parkway )
Overland Park, KS 66251 )
and )
)
)
JP MORGAN CHASE & CO. )
Serve at: 270 Park Avenue )
New York, NY 10017 )
and )
)
)
)
J.P. MORGAN INVESTMENT MANAGEMENT, )
INC., d/b/a JP MORGAN ASSET )
MANAGEMENT )
Serve at: 270 Park Avenue )
New York, NY 10017 )

7

and                                    )
                                       )
                                       )
J.P. MORGAN INVEST HOLDINGS, LLC        )
f/k/a J.P. MORGAN INVEST, INC.          )
<u>Serve at</u>:        270 Park Avenue  )
                New York, NY 10017      )
                                       )
        and                            )
                                       )
David Embry                            )
<u>Serve at</u>:        1215 W. 57th Terrace  )
                Kansas City, Missouri, 64113  )
                                       )
        and                            )
                                       )
Jennifer Mendicki O'Neill              )
                                       )
<u>Serve at</u>:        4618 Warwick Road, #4D  )
                Kansas City, Missouri, 64112  )
                                       )
        and                            )
                                       )
James E. Staley                        )
                                       )
<u>Serve at</u>:        270 Park Avenue  )
                New York, NY 10017      )
                                       )
                        DEFENDANTS.     )


## FIRST AMENDED PETITION

Plaintiffs allege as follows:

## INTRODUCTION

1.      This case arises from the false misrepresentations and willful misconduct by

J.P. Morgan Retirement Plan Services, LLC ("JPMRPS") and its agents and co-conspirators,

JP Morgan Chase & Co. ("JPMC"), JP Morgan Investment Management, Inc. ("JPMAM"), J.P. Morgan Invest Holdings, LLC, f/k/a J.P. Morgan Invest, Inc. ("JPMI") and the individual defendants, David Embry, Jennifer Mendicki O'Neill and James E. ("Jes") Staley, who were each officers or managers of JPMRPS or a controlling person of JPMRPS in a scheme by these defendants to unlawfully enrich JPMRPS, and its agents or conspirators at the expense of the Plaintiffs. All defendants are hereinafter collectively referred to as "JPM", "JP Morgan" or, at times, "defendants".

2. The scheme to unjustly enrich JPM entailed the sale to the Plaintiffs of the stable value product, that JPM called "SAIF" (standing for "Stable Asset Investment Fund") and referred to herein as "SAIF", "JPM Stable Value Product" or "JPM Product". Defendants wrongly profited from the sale of the JPM Product by misrepresentations and willful, deceptive practices that induced Plaintiffs to purchase the JPM Product, while unbeknown to Plaintiffs, the hidden risks of the JPM Product belied the represented safety of the claimed superior yield performance, and the represented stability in the investment return of SAIF.

3. Starting as early as 2005 (including specific meetings at GEHA's Missouri offices on March 19 and August 1, 2005 and just before July, 2006) and continuing through the first half of 2008, in meetings and contacts led by JPMRPS, the defendants conspired and acted in concert to represent to Plaintiffs and the Plaintiffs' agents that the JPM Product would give superior return, superior market-to-book value and at the same time employed less risk than other stable value products, when in fact it contained riskier, lower quality mortgages and other debt instruments, and riskier private, self-rated mortgages with overstated market value. This disguised higher risk (taken in an attempt to gain a higher yield) caused the JPM Product to perform poorly during the financial downturn, generally the last-quarter of 2008 through the

9

present. JPM misrepresented the market value of asset-backed or mortgage backed investments and the actual risk and the past performance of the JPM Product sold to Plaintiffs. Further, JPM misrepresented that the JPM Product had the same attributes, such as liquidity, as money market funds when, in fact, a sizable portion of the JPM product lacked liquidity.

4. Part of the scheme involved steering Plaintiffs' investment options away from safer and better-run stable value products, like the American Century Stable Value Product, for the purpose of getting Plaintiffs into the JPM Product from which JPM could earn multiple disclosed and undisclosed fees.

5. By the scheme, JPMRPS itself profited by receiving monies equal to 50% of the disclosed management fee and by earning or receiving other substantial internal incentive credits—all using misrepresentations to push SAIF over competing, superior stable value funds.

6. The allegations in this Petition are supported by findings of an arbitration panel that issued a $373 million award against JPMRPS on August 10, 2011 in connection with JPMRPS's promotion of the JPM Stable Value Product over the superior stable value product offered by American Century. Those findings were set out in a 72-page opinion of an independent panel consisting of a former judge and two AAA panel lawyer-arbitrators experienced in complex financial litigation. Each of the individual defendants were witnesses in that six week arbitration, which took place in February-March, 2011. As found by the arbitrators, the individual defendants (Embry and Mendicki O'Neill) "had their compensation impacted through bonus pool amounts…connected to the placement of JPMAM products and their personal employment positions informed by an understanding that sales and promotion of JPMAM products were more beneficial to their careers."

10

7. In meetings held just before the July 2006 transfer of over $30 million in plaintiffs' monies to the JPM Product, defendants represented that the JPM Stable Value Product was, "your most conservative investment option." In many forums, including its website and in multiple presentations, including presentations to Plaintiffs and to Plaintiffs' representatives, JPMRPS and its agents/co-defendants, misrepresented JPM Stable Value Product as having less risk and higher yield than other stable value products.

8. JPMs' sales ploy was a ruse. While JPM touted the conservatism of its JPM Product, JPM in fact used its JPM Stable Value Product as a vehicle for placement of mortgages and other debt instruments having a higher risk (both liquidity and credit risks) and lower quality, hoping that by taking this hidden risk it could gain a higher yield.

9. JPM's misrepresentations led to Plaintiffs' investment in the JPM Stable Value Product during the financial crisis that centered on the years between 2008-2010. At all material times, while defendants sold the JPM Product as a stable value fund, defendants were in fact diverting a substantial portion of the assets of the JPM Product into unduly risky mortgage-backed assets that were in many cases, generated, priced and even self-rated by a JPM affiliate company.

10. JPM used the sales promise of an enhanced yield from its JPM Product (which it achieved by taking undisclosed and inappropriate risks, and by self-rating and valuing "Private Mortgages") to build its sales of the JPM Product, thereby earning multiple layers of fees, some undisclosed, that benefitted defendants. In sum, JPM employed deceptive practices in order to gain millions of dollars in fees.

11. JPM knew, before the financial crisis, of the risks inherent in the JPM Product and thus to the safety of the JPM Product's yield versus other stable value products' yield.

11

Through its misrepresentations defendants intentionally exposed Plaintiffs to future yield underperformance and liquidity constraints.

12.     JPM and affiliated companies decided in October 2006 – shortly before the subprime storm hit Wall Street and Main Street alike with full force – to dump major portions of their then considerable investment positions in low quality mortgage assets. JPM knew that SAIF contained low-quality mortgage assets, yet sold SAIF to Plaintiffs as a low risk investment.

13.     Starting in late 2006, JPM and affiliated companies had more than $12 billion of low-rated mortgage assets on JPM's "books". Thus at the same time that JPM and/or affiliated companies were selling their own positions in lower quality mortgages, similar low-rated and illiquid mortgage positions were placed in the JPM Stable Value Product, which was sold to Plaintiffs. While at the same time JPM was reducing its exposure to lower rated mortgage loans, it was marketing the SAIF with this increased risk exposure to purchasers of its JPM Stable Value Product, which, by representation, was supposed to combine the safest, most conservative investment choice and a higher yielding fund than other stable value products.

14.     While this ploy benefited defendants in the accumulation of billions of dollars into the JPM Product, from which it reaped profits, it harmed Plaintiffs and other purchasers of the JPM Product, who were stuck with the significantly declining yield on risky mortgages starting in 2008. These higher- risk mortgage positions explain why the JPM Product temporarily outperformed competitor stable value funds until the start of the financial crisis, then fell behind its competitor funds, return-wise, by a wide margin. This ploy was not happenstance. By attracting Plaintiffs' investment monies by promising a safer product with higher yields, JPMRPS and its agents gained for themselves the earnings from the multiple fees charged for monies put into SAIF.

12

15.     In November, 2008 and subsequent months, the JPM Product's market value fell to as low as the mid-80 percent. The average stable value fund at that time had market values in the mid-90 percent according to Hueler, an industry data reporting service.

16.     Through the aforementioned course of self-dealing, JPMRPS and its agents violated Missouri's Merchandise Practices Act and breached the duties set out in the counts presented below. These breaches have directly and proximately caused Plaintiffs to suffer significant financial harm. Damages to Plaintiffs have manifested themselves in, among other things, substantial diminution in their investment returns on the JPM Product. This action seeks to obtain relief from defendants' wrongful acts, including damages sustained by Plaintiffs and ill-begotten profits JPM got as a direct and proximate result of those acts.

17.     Defendants at all material times just before and during the financial crisis knew that a substantial portion of JPM's higher-risk mortgage and other assets, were being sold to Plaintiffs via touting SAIF as a "stable" and "conservative" investment product. Those moves were undertaken by defendants with an "eagle eye" to defendants' benefit and a callous indifference to the truth.

18.     Defendants' willful and malicious misconduct has directly and proximately harmed Plaintiffs.

## PARTIES

19.     Plaintiffs are employees of Government Employees Health Assessment (GEHA) which purchased and invested in the JPM Stable Value Product (sometimes referred to by JPM as "SAIF"), during approximately 2008-2010. GEHA is located in Jackson County, Missouri, with offices in Independence and Lee's Summit, Missouri where Plaintiffs were

13

employed. It was in meetings in the GEHA offices that the misrepresentations by JPM took place.

20.    Plaintiffs' claims are brought against parties who disclaim that they are fiduciaries as defined by ERISA. Plaintiffs assert claims under Missouri law. In the Participation Agreement, Plaintiffs' Plan granted discretionary authority or control over management of the Plan or its assets to a non-party to this case, JP Morgan Chase Bank, N.A. The Plaintiffs' Plan gave only non-party Bank, N.A. management authority. Each defendant is being sued for its deceptive sales and marketing practices in which each defendant was part of the scheme to put forward willful deceptive misrepresentations about the safety of SAIF's investment return and other attributes. The alleged scheme is about deception and willful misconduct in the sale by defendants of the JPM product to Plaintiffs.

21.    JPMRPS is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business now located at the Sprint Campus on College Boulevard, Overland Park, Kansas. At the time of the acts alleged herein, JPMRPS was located on Ward Parkway in Jackson County, Missouri.

22.    JPMRPS has at all relevant times represented that it is not an ERISA fiduciary to its client Plans. In its April 1, 2001 Agreement with the GEHA Plan Administrator, JPMRPS asserted that the "Plan Administrator is the fiduciary under the Plan". Further, in describing its services to the Plan, JPMRPS stated that it "shall be liable to the Plan or its Participants only for its negligent actions, negligent failure to act, or willful misconduct of itself or its agents, or as required by applicable law." By contract, JPMRPS sought to exclude ERISA liability.

23.    Further, in its renewal and updated agreement(s), JPMRPS agreed and asserted that its services did not require it to: "act as a fiduciary with respect to the Plan or to

exercise any discretionary authority or discretionary control with respect to the. . . assets of the Plan" and that "its relationship" with the Plan Sponsor was "that of independent contractor."

24.     The SAIF was and is "established, operated and maintained" exclusively by an entity not a party to this case, the SAIF Trustee JP Morgan Chase Bank, N.A. (Bank, N.A.). In its Declaration of Trust, Bank, N.A. alone assumed the role of Trustee and ERISA fiduciary:

> Section 1.1. **Title.** "The title of the trust fund hereby established shall be "Commingled Pension Trust Fund (Stable Asset Income) of JPMorgan Chase Bank, N.A." (formerly known as the Bank One Asset Income Fund)."

> Section 1.2. **Purpose.** "JPMorgan Chase Bank, N.A., a national banking association. . . is adopting this Declaration of Trust as successor trustee to the Bank One Trust Company, N.A. of the Bank One Stable Asset Income Fund. . . This commingled trust fund is established, operated and maintained by JPMorgan Chase Bank, N.A. exclusively as a medium for the collective investment and reinvestment, without distinction between principal and income, of moneys or other assets of participating trusts."

> Section 1.3. **Definitions.** "…(d) The term "Trustee" shall mean JPMorgan Chase Bank, N.A. . ."

> Section 1.4. **Effect of Declaration of Trust.** "The provisions of this Declaration of Trust, as the same may be amended from time to time, shall control all participations in the Commingled fund and the rights and benefits of all persons interested in such participations as beneficiaries or otherwise. "

> Section 4.1. **Title, Custody and Location Investments.** "The ownership of all of the assets in the Commingled fund shall be vested solely in the Bank as Trustee and shall be considered as assets held by it as Trustee."

15

*Section 4.3.* **Additional Investment Provisions.** ". . . the Trustee shall have the power to: (1) invest and reinvest any moneys at any time forming any part of the Commingled fund in any property. . .

Trustee shall invest the assets of the Commingled Fund in a manner consistent with the provisions of ERISA. . .(e) The decision of the Trustee as to whether or not an investment is of a type which may be purchased for the Commingled Fund shall be conclusive."

*Section 4.4.* **Additional Powers of the Trustee.** ". . . (g) to cause or authorize any investments from time to time held by it to be registered in, or transferred into its name as Trustee, or the name of its nominee, or in the name of any other nominee, or to retain them unregistered or in form permitting transferability by delivery; and to deposit any such investments in or with any depositary, sub-custodian, clearing corporation, or any central system for handling of investments, or any nominee thereof; but the books and records of the Trustee shall at all times show such investments are part of the Commingled fund;. . ."

*Section 5.1.* **Division into Units.** "The Commingled Fund shall be divided into units and the proportionate interest of each participant shall be evidenced by the number of units and fractions of a unit allocated to it based upon the amount of the moneys of such participant paid into the Commingled fund. The original value of each unit of participation shall be determined by the Trustee. . ."

*Section 6.1.* **Frequency of Valuation.** ". . .the Trustee shall determine the value of the Commingled Fund and the units thereof in the manner prescribed in this Declaration of Trust. . ."

*Section 8.1.* **Participation Records.** "Records shall be maintained for the Commingled Fund which shall show with respect to each participant:

    (a) The date of each admission to the Commingled Fund, the number of units allotted and the amount paid therefor;

    (b) The date of each withdrawal, the number of units redeemed, the amount paid on redemption to the

16

participant and whether payment was made in cash, in kind or partly in cash and partly in kind:. . ."

**ARTICLE IX. MANAGEMENT FEES AND EXPENSES.**
**Commingled Fund-Institutional Class:** ". . . The Trustee shall charge a management fee directly against the Commingled Fund-Service Class in the amount of 45 basis points (0.45%)

**ARTICLE XIII. ACCEPTANCE OF TRUST AND TRUST FUND.** "JPMorgan Chase Bank, N.A. by execution of this Declaration of Trust hereby signifies its acceptance of the trust and trust fund created hereunder and acknowledges that as Trustee it is a fiduciary with respect to each participating trust which is an employee benefit plan subject to ERISA."

25.     On July 14, 2005, the Bank, N.A. and the GEHA Plan sponsor entered into the "SAIF Participation Agreement", the Plaintiffs' Plan authorized only the "Trustee [Bank, N.A.] to invest assets of the Plan in the Fund." And the Plan authorized that only the Bank, N.A. "shall be entitled to compensation for its management fee." And the Plan appointed Bank, N.A. as "the Trustee of the Plan with respect to assets of the Plan invested in the [SAIF] Fund." The Bank, N.A. "agreed to and accepted" these terms.

26.     JPMI, a corporation, is organized and existing under the laws of the State of Delaware, and has its place of business at 270 Park Avenue, New York, New York. Upon information and belief, JPMI is an affiliate of JPMRPS and sits above JPMRPS in the corporate structure.

27.     JPMAM is the marketing entity for JP Morgan Products. JPMAM is being sued for its sales and marketing actions in which it put forward willful, deceptive misrepresentations about SAIF that led to Plaintiffs' investment in SAIF. JPMAM is a Delaware corporation with its principal place of business at 270 Park Avenue, New York, New York 10017. JPMAM is an affiliate company to JPMRPS and it uses the name "JP Morgan Asset

17

Management" in its marketing and selling, through and in conjunction with JPMRPS, the SAIF product.

28. The ultimate parent of each corporate defendant is JPMorgan Chase & Co. ("JPMC"). JPMC is a component of the Dow Jones Industrial Average and serves millions of consumers in the United States. It has over 200 subsidiary companies including the defendant affiliates named in this suit. All JP Morgan entities report consolidated earnings or profits through JPMC. JPMC's liability, in part, is based on respondeat superior principles and on its active steps to induce its subsidiaries JPMRPS, JPMAM and JPMI to defraud and deceive Plaintiffs. Its stock is sold and traded under the symbol "JPM."

29. David Embry was the Senior Vice President of JPMRPS in charge of marketing and sales during the time of the sale of the JPM Product to Plaintiffs. He was a major participant in and had control of the scheme set out in this Petition. He is a Missouri resident who resides just off Ward Parkway in Kansas City, Missouri. He and defendant O'Neill profited from the sale of the JPM Product through bonuses and other additional compensation. In addition, JPMRPS and JPMAM profited by pushing and selling the risker JPM Product to Plaintiffs.

30. Jennifer Mendicki O'Neill is a Strategic Relations Manager with JPMRPS who resides in Jackson County, Kansas City, Missouri. She earned bonuses and other compensation from the sale of the JPM Stable Value Product over less risky stable value products sold by American Century and other institutions and was a participant in the scheme set out herein. She and other JPM employees attended the meetings at GEHA offices and supplied marketing materials to Plaintiffs and Plaintiffs' agents at the meeting identified in this Petition.

18

31.     James E. Staley, an individual, is a New York resident.  He held officer positions in both JPMC and JPMAM.  At times relevant to the claims asserted herein, he was the CEO of JPMAM.  Mr. Staley was also a managing director of JPMC and served on the Executive Committee of JPMC.  Through acts of Mr. Staley and others, JPMC took affirmative steps to induce and pressure JPMRPS , JPMI and JPMAM to commit the willful misconduct set out in this petition.  The JP Morgan entities named as defendants are controlled and directed through common or interlocking directors or officers, including Staley.  Staley directly orchestrated the purchase of JPMRPS in 2003 from a Missouri company, American Century, and held ultimate decision-making authority over and directly participated in the activities alleged herein including ordering and/or approving the acts that induced Plaintiffs' purchases of the JPM Stable Value Product.  During the same time period of JPM's wrongful sales scheme (which include specific meetings on March 19 and August 1, 2005 and other meetings in 2006 prior to and after Plaintiffs' "mapping" of over $30 million to SAIF), Staley was presented with direct evidence of the higher risks inherent in SAIF and, in spite of that knowledge, he permitted, promoted and directed the continued wrongful advertising, marketing and sale of the JPM Stable Value Product through JPMRPS's direct contacts with Plaintiffs and Plaintiffs' representatives.  Staley pushed for inclusion of JP Morgan proprietary products, like the JPM Stable Value Product, to the exclusion of better performing funds or funds charging less fees to investors. His motive was to increase JPM profits at the expense of Plaintiffs. Staley's conduct in this regard was recently reported in July 2 and 3, 2012 media articles, including in the <u>NY Times</u>, and such conduct was recently described in a 72 page Arbitration Award of $373 million against JPM, which this Court has previously affirmed and upon which this Court has entered judgment.

19

32. For the purpose of the acts alleged herein, the corporate defendants are alter egos of JPMRPS and operate as an instrument of JPMRPS to achieve profit goals and to commit the wrongful representations alleged herein. Further, the defendants Staley, Embry and O'Neill conspired with, acquiesced in, participated in and/or directed the inequitable and tortious acts and the violations of Missouri statute and common law set out in this Petition. For purpose of this Petition and because of the alter ego and interlocking agency relationship with JPMRPS, all references herein to "JPM" or to "JP Morgan" are inclusive of and by definition include all defendants.

33. While JPMRPS and the other defendants may technically exist as separate corporations, the individual defendants controlled, directed, oversaw, and executed the policies and the scheme conducted by JPMRPS and its agents.

34. Plaintiffs' are informed and believe, and therefore allege, that at all relevant times each of the individual defendants were acting within the course and scope of their employment and with the ratification and approval of JPMRPS, and/or JPMAM, JPMI and JPMC.

35. Defendants are individually sued as participants, agents and as aiders and abettors in the improper acts, plans, schemes by the defendants to advertise, market, and sell the JPM Stable Value Product to Missouri residents.

36. Missouri law, as invoked in the causes of action asserted herein, provides a relief to Plaintiffs in a manner not impinging upon or duplicative of any federal law or regulation.

37. Defendants have participated as conspirators in furtherance of the JPMRPS' willful misconduct set forth herein or have acted with or in furtherance such scheme in carrying

20

out their purposes as alleged in this Petition, and have performed unlawful acts and made false and misleading statements in Missouri in furtherance of their violations of Missouri law as alleged herein and currently.

## JURISDICTION AND VENUE

38.     The Court has personal jurisdiction over each defendant because the causes of action asserted herein arise out of the defendants' commission of tortious and inequitable acts, and breaches of Missouri's Merchandising Practices Act, all of which occurred in, were directed at, and/or caused injury and damage to the Plaintiffs in Jackson County, Missouri.

39.     The Court also has personal jurisdiction over each defendant because each defendant is subject to general and specific jurisdiction in the State of Missouri and/or resides in Missouri.

40.     Venue is proper in this Court because Plaintiffs were first injured and continue to be injured in Jackson County, Missouri, by defendants' commission of tortious acts and in Jackson County, Missouri and because Plaintiffs are located in Jackson County, Missouri and defendants JPMRPS, Embry and Mendicki O'Neill were located in Jackson County, Missouri at the time of the acts of breach and the tortious acts and injuries alleged herein.

## MARKETING AND SALE OF JP MORGAN STABLE VALUE PRODUCT

41.     Bank, N.A. unilaterally calculated the JPM Product's Net Asset Value ("NAV") or private market price of SAIF.

42.     JPM caused Plaintiffs to purchase the product at the artificial value it calculated- at a value that was in excess of its true "mark-to-market" value, thereby damaging Plaintiffs.

21

43. The investment product sold by defendants and purchased by Plaintiffs is a pooled stable value product, meaning JPM sold this product to others who "pooled" their money into one investment product.

44. JPM touted the JPM Stable Value Product as offering the utmost in safety and liquidity while beating the returns of other stable value funds and money market funds, and as invested in "investment grade" fixed income securities. A stable value fund, by common, industry definition, invests in high-quality, liquid, diversified, fixed-income debt and is designed to preserve the capital of those who buy the product while providing steady, positive above-money-market rates of return. JPM misrepresented that the liquidity of the JPM Stable Value Product was the same as money market fund.

45. Defendants marketed and sold the JPM Product as a typical stable value fund. In their marketing materials, Defendants described the product as "seeking to preserve the value of money invested," and "perform[ing] better than the average money market fund, and earn[ing] consistent, reliable returns." Defendants represented the product to be invested in "high quality fixed income portfolio," and stated that "the fixed income portfolio consists of investment grade fixed income securities." Defendants touted "SAIF" as providing superior returns to competing stable value products. These misrepresentations were made on the website "Fact Sheets," in marketing materials and at the meetings with the Plaintiffs and Plaintiffs' representatives.

46. Defendants emphasized that the JPM Product was a typical stable value fund, not only by calling it "Stable Value," "SAIF" or a "Stable Asset" Fund, but also by their characterization of the risk level of the JPM Product. On a scale of 1-5, with 1 being the most conservative and 5 being the most aggressive, defendants consistently stated that the JPM

22

Product was a 1 (most conservative). JPM stated publicly that the JPM Product is among the "most conservative" investments possible.

## Performance of the JPM Stable Value Product

47.    JPM touted SAIF's results as outperforming its competitors. Defendants drew investors to the JPM Product by emphasizing this artificial, temporary, above-market performance (compared to other stable value funds) never disclosing that it gained performance by taking higher risk. For example, just before the financial crisis, the JPM Product reported returns in 2006 over 5%. At no time did JPM disclose that the SAIF used higher risk collateralized or asset backed instruments and utilized self-rated and self-valued investments in its JPM Product as a means of accomplishing those returns.

48.    JPM's scheme involved specific misrepresentations to Plaintiffs' agents and Plan fiduciaries in meetings in and after July, 2006 transfer of over $30 million by Plaintiffs to SAIF and continued misrepresentations through 2011 that kept Plaintiffs in SAID and induced additional money flows from Plaintiffs into SAIF.

49.    At times in this period and in specific meetings discussed above, JPM touted SAIF's book-value return performance as consistently above the Citigroup 3-month Treasury Bill Index and other indexes, which defendants held out as relevant benchmarks. However, the Citigroup 3-month Treasury Bill Index is comprised entirely of liquid, high-quality, investment grade securities. JPM did not disclose that SAIF self-valued certain investments to rig the reported book and market values of the JPM Product.

50.    From the last quarter of 2008-2011, the JPM Product's performance changed dramatically. Thus, competitor stable value funds and the industry benchmarks markedly outperformed the JPM Product. JPM's Product trailed its peers for each year since 2008

23

according to Hueler. Over this period, the JPM Product's investment yields dropped

precipitously. At the same time, the JPM Product's benchmarks greatly exceeded the JPM

Product's yield, and competitors' stable value funds were consistently yielding higher annual

returns. Had the JPM Product been as represented, and had not been invested in unduly risky

mortgage debt with significant undisclosed fees, the JPM Product's yielded returns from the last

quarter of 2008 to date would have been substantially higher.

51.     For the years 2008 to date, the losses to Plaintiffs from the reduction in yielded

returns of the JPM Product caused by JPM's wrongful conduct are estimated, prior to receiving

JPM's data, to exceed $1 million. This underperformance relative to true stable value funds

accretes daily as Plaintiffs have lost compounding effects, and because JPM "gated" the JPM

Product, meaning certain restrictions were put in place that barred, deterred, or inhibited

Plaintiffs or their employer plan administrator, from removing their assets from the JPM Product

and going to stable value funds or other investment products with higher yields.

## JPM Failed to Disclose Plaintiffs Exposure to Risky Assets

52.     Leading up to 2008 (and even afterwards), defendants stated (including web site

"Fact Sheet" postings) that the JPM Product's portfolio of investments consisted of investment

grade, fixed-income securities, primarily U.S. Treasury, agency, corporate, mortgage-backed,

asset-backed, and privately placed mortgage debt, and that the JPM Product's risk was less than

other stable value funds and other low risk investments products. Specifically, in the meetings,

prior to July, 2006, set up by JPMRPS and Mendicki with Plaintiffs' representatives in GEHA's

Missouri office, JPM made these precise misrepresentations to the Plaintiffs and Plaintiffs'

representatives. These representations were untrue when made and defendants knew they were

untrue.

24

53.     The JPM Product contained proprietary mortgage assets JPM originated through a fund called the Mortgage Private Placement Fund ("MPPF") and that it called "Private Mortgages." During 2008-2010, as much as 15- 20% of all JPM Product's assets consisted of Private Mortgages originated by Bank, N.A. Along the way, JPM extracted multiple fees, beginning with the undisclosed fees for the origination of the Private Mortgages placed within the MPPF, to undisclosed fees from the "replacement" of these mortgages into collective funds, and the fees embedded in the "Intermediate Bond Fund" placed within the JPM Stable value product.

54.     The MPPF issued its own commercial loans for which it received various origination and loan fees. Then, SAIF tacked on yet an additional "management fee", charging Plaintiffs for all the fees taken, while only the last management fee was disclosed.

55.     Defendants falsely advertised and sold SAIF as having lower fees than other stable value funds (or at least commensurate fees) when in fact when the undisclosed fees are considered, SAIF's fees were much higher than competing, less risky stable value funds.

56.     The upshot is that defendants surreptitiously failed to disclose fees from origination of Private Mortgages and other investments through a series of  investments in JPM's Intermediate Bond Fund that were eventually held by the JPM Stable Value Product.

57.     Defendants failed to disclose the self-dealing, fee-layering scheme, and concealed the strategy to gain multiple levels of fee extractions.

58.     This fee-generating, fund-layering strategy allowed defendants not only to mask the magnitude of allegedly safe JPM Product's exposure to risky investments, but led to profit from layers of undisclosed fees and expenses generated by investment in each of the many layers of the funds in question. In some cases, fees were captured for a fund multiple times by investing

25

in it more than once. In some cases, such as securitized packages of auto loans, those asset back securities were actually issued by JPM affiliates.

## SAIF NOT "INVESTMENT GRADE"

59.     Contrary to JPM's representations, neither the JPM Product's Private Mortgages nor many of its asset backed securities embedded in the JPM Product were "investment grade." Nor were the Private Mortgages rated by a third-party credit-rating agency, which would have produced an objective credit rating for such mortgages.

60.     SAIF had made up its own credit ratings and market values for the Private Mortgages and other unrated securities.

61.     JPM touted to Plaintiffs and Plaintiffs' representatives that its Investment Guidelines for SAIF prohibited the purchase of issues rated below investment grade. It posted this misrepresentation in "Fact Sheets" on its website. By self-rating its own Private Mortgage, JPM surreptitiously never appeared to be violating what it represented to Plaintiffs and Plaintiffs' representatives.

62.     The Private Mortgages in the MPPF and SAIF had not been mark-to-market as represented at the time defendants sold SAIF to Plaintiffs.

### Defendants' Caused Substantial Damages to Plaintiffs

63.     Higher (i.e. lower rated) risk and illiquid assets (such as, among others, Private Mortgages) were unsuitable for a stable value fund, and JPM recognized the inappropriate nature of this asset class before the financial crisis. Even in 2007, while JPM was well aware that the lower-rated mortgage-based securities derived from housing mortgages were about to collapse, it continued misrepresent the nature of the stable value product to Plaintiffs. This was done to quickly grow the assets in SAIF through the promised higher yield and misrepresented lower risk which meant profits to JPM, as SAIF was a proprietary product. If JPM had touted and sold a

26

truly conservative fund from a third-party, like the American Century Stable Value Fund, for example, JPM would not get credit for all the fees—American Century would in large part get that fee. In doing so, defendants thus looked to benefit themselves while exposing risk and eventual injury to the Plaintiffs.

64.    The JPM Product invested as much as 40 percent of assets in below-investment grade or illiquid assets not suitable for a fund represented as a stable value fund. Moreover, as discussed above, defendants concealed this by misrepresenting the actual risk. At times, defendants brazenly and falsely touted the JPM Product as "safer" than riskless assets. This was presented in "standard deviation charts" used in 2005-2006 and widely distributed to clients of JPMRPS in order to sell the SAIF product.

65.    In the end, defendants' unlawful scheme caused Plaintiffs to pay too much – both in the purchase prices that was above the true market value and in fees. This led to diminished returns or lower yield in the JPM Product from the last quarter of 2008 to date compared to a stable value product which was as represented.

66.    The JPM Product's Private Mortgages suffered a substantial loss of value, and the JPM Product began—post 2008—to write down the market value and related prices for the Private Mortgages and for other investment assets. This caused the JPM Product's annual yield to Plaintiffs, especially relative to competitor stable value funds, to fall. In an effort to conceal its unlawful acts, defendants have adopted the excuse of blaming the JPM Product's lower returns on other factors, when in actuality the lower returns were due to the self-dealing schemes and JPM's misrepresentations used to induce Plaintiffs to purchase the JPM Product. The JPM Product underperformed its peers.

27

67. The annual returns on the JPM Product have been far less than they should have been if only assets of the represented quality and liquidity had been placed into the JPM Product.

68. Moreover, the JPM Product began using crediting rates (yield) set by negotiation and monthly yields, rather than by the formulas required by the wrap (insurance) contracts. Those formulas were in place to protect investors in the JPM Product. If defendants had disclosed the actual conditions under which the crediting rated (yield) was being set, Plaintiffs (and others) would have been aware earlier of the real losses in the JPM Product due to Private Mortgages and other improper investments. But they were not.

69. Furthermore, defendants intentionally omitted important accounting details about the JPM Product's investments and otherwise failed to fully advise Plaintiffs and other investors in the JPM Product of market value losses related to the Private Mortgage. By not marking the Private Mortgages to market, Plaintiffs had concealed from them the losses that would eventually cause the yield to fall on the JPM Product.

70. Defendants gained at least two advantages from the alleged wrongful conduct: First, there was a quick build-up assets in SAIF (a small fund originally acquired in its 2005 purchase of Bank One). By misrepresenting and pushing its own proprietary, Stable Value Fund, defendants earned bonuses and profits not available to them if they sold non-proprietary products that were as represented. Second, because JPM affiliate entities were involved in multiple levels of the transactions used to create the JPM Intermediate Bond Fund sold to SAIF, JPM affiliate entities could and did receive substantial undisclosed fees from the Intermediate Bond Fund and assets it purchased or brought into that underlying Fund.

71. Defendants were well aware that the actions complained of herein – both prior to and during the 2008 through 2011 period – were improper. JPM sought to keep from the public

its scheme. Agreements with "wrap" insurers were struck to not reveal to the public the issues with the JPM Product.

72.     Because of JPM's misrepresentations, Plaintiffs overpaid for purchasing (*i.e.* entering, reinvesting and remaining in the JPM Product) and starting in the last quarter of 2008 received a lower rate of return than the JPM Product would have yielded if it had been represented as a true stable value fund. There is a direct relationship between the losses to Plaintiffs and defendants' unlawful conduct, which proximately caused the Plaintiffs' injuries.

### FIRST CAUSE OF ACTION
**(For Violations of Missouri's Merchandising Practices Act,
Mo. Rev. Stat. §407.010, *et. seq*)**

73.     Plaintiffs hereby incorporate by reference and re-allege all paragraphs previously alleged herein into all counts including this count. Plaintiffs assert the cause of action against all defendants.

74.     Missouri's Merchants Practice Act, Mo. Rev. Stat. § 407.010, *et seq.* substantially regulates the relationship and wrongful activities set out in this Petition.

75.     Plaintiffs and defendants are "persons" within the meaning of section 407.010(5).

76.     Defendants' activities, marketing, and services constitute the sale of "merchandise" within the meaning of section 407.010(4).

77.     Beginning in October, 2008, Plaintiffs by their continued investments and by new purchases, purchased the JPM Product and paid the fees for JPM services.

78.     As set forth herein, defendants' acts, practices and conduct violate section 407.020(1) of Missouri's Merchandising Practices Act in that, among other things, defendants used and/or continue to use deception, misrepresentation, unfair practices,

29

concealment, suppression and/or omission of material facts in connection with the advertising, marketing, and offering for sale of the JPM Stable Value Product.

79. Defendants' unfair and deceptive acts, practices, and conduct include concealing fees and failing to disclose material facts about the monies defendants' obtained from selling the JPM Stable Value Product to Plaintiffs.

80. Defendants have also failed to disclose and actively concealed loan origination and other fees to Plaintiffs.

81. Defendants' conduct violates the Missouri's Merchandising Practices Act pursuant to state regulations 15 C.S.R. § 60-8 because their conduct: (1) offends public policy; (2) is unethical, oppressive, and unscrupulous; (3) causes substantial injury to consumers; (4) was not in good faith; (5) is unfair because Defendants' charged consumers for services which the customer had not ordered or solicited; and (6) is unconscionable.

82. Defendants' acts were undertaken with malice and callous indifference to the interests of the Plaintiffs, thereby subjecting defendants to an award of punitive damages.

83. Plaintiffs seek actual damages; a determination that defendants' methods, acts, and practices violate the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et seq.*; disgorgement of all profits or revenues (fees) obtained from defendants' misrepresentations; pre-and post-judgment interest; punitive damages; attorneys' fees, litigation expenses and costs; and any and all other relief that the Court deems just and proper.

### SECOND CLAUSE OF ACTION
### (Money Had and Received)

84. Plaintiffs hereby incorporate by reference and re-allege all paragraphs previously alleged herein.

30

85.    Defendants have been enriched by the money they made with misrepresentations and failures to disclose critical information in connection with the sale of JPM Stable Value Product to Plaintiffs. .

86.    Defendants obtained this money through wrongful, unfair and deceptive practices.

87.    Defendants fail or failed to provide fair consideration to Plaintiffs in exchange for the fees obtained.

88.    Defendants' acts were undertaken with malice and callous indifference to the interests and rights of Plaintiffs', thereby subjecting defendants to an award of punitive damages.

89.    Equity and good conscience require restitution to Plaintiffs. Plaintiffs have been wrongfully deprived of their money and are entitled to its restoration, along with interest thereon from the date the money was taken by defendants to the date of judgment and Plaintiffs are entitled to disgorgement of money received from JPM's misrepresentations and failures to disclose, together with prejudgment interest on all amounts rewarded, punitive damages, attorneys' fees, expenses and costs, and any other relief the Court deems necessary and proper.

### THIRD CAUSE OF ACTION
**(For Unjust Enrichment)**

90.    Plaintiffs hereby incorporate by reference and re-allege all paragraphs previously alleged herein.

91.    Defendants have received and continue to receive benefits (profits, bonuses, credits and fees) at the expense of Plaintiffs and it is inequitable for defendants to retain these benefits.

31

92.     Through their ultimate payment of the multiple fees, Plaintiffs have conferred monetary benefit on defendants and defendants have unjustly profited from that monetary benefit. Plaintiffs have not received corresponding benefit.

93.     Defendants have accepted and retained the benefits unfairly conferred upon them to the detriment of Plaintiffs.

94.     Defendants' actions were undertaken with malice and callous indifference to the interests of Plaintiffs, thereby subjecting defendants to an award of punitive damages.

95.     As a direct and proximate result of defendants' unlawful acts and practices, Plaintiffs have been wrongfully deprived of their money and are entitled to its restoration, along with interest thereon from the date the money was taken by the defendants to the date of judgment, JPMS has been unduly and inequitably enriched and is not entitled to keep the fruits of its unjust scheme, all these monies should be awarded plaintiffs along with prejudgment interest, punitive damages as well as attorneys' fees, expenses and costs, corrective notice, and any other relief the court deems necessary and proper.

## FOURTH CAUSE OF ACTION
### (For Fraud)

96.     Plaintiffs hereby incorporate by reference and re-allege all paragraphs previously alleged herein.

97.     Defendants represented the JPM Stable Value Product was a conservative investment option, having both superior performance and less risk than other stable value products, that it was invested in investment grade fixed-income securities, that it was invested in

32

a high-quality fixed income portfolio, that it was the most conservative of investments and that it was safer than US Treasuries, and defendants failed to disclose that the JPM Stable Value Product contained low quality and high risk investments, many of which were originated or previously held by JPM, for which JPM received multiple excessive and undisclosed fees.

98.     Defendants had a duty to make full and accurate representations to Plaintiffs and to disclose all relevant and material facts about the JPM Product.

99.     Defendants representations were false in that the assets and JPM Private Mortgages placed into the JPM Stable Value Product were inappropriate for a stable value product, were not investment grade fixed income securities, were not high-quality, were not the most conservative of investments, were not safer than US Treasuries and violated the credit rating and investment guidelines for the JPM Product.

100.     Defendants knew the representations were material and were false when made and knew their failures to disclose would be material to Plaintiffs' decision to purchase and remain invested in the JPM Product.

101.     Plaintiffs relied on defendants' false representations and omissions in deciding to purchase and remain invested in the JPM Product.

102.     Defendants acts and omissions were undertaken with malice and callous indifference to the interests of Plaintiffs, thereby subjecting defendants to an award of punitive damages.

103.     Defendants' conduct constitutes fraud and Plaintiffs seek actual damages, pre- and post-judgment interest, punitive damages, attorneys' fees and costs and any and all other relief that the Court deems just and proper.

33

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs requests judgment and relief on all causes of action as follows:

A.     For judgment that defendants have violated the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et seq.*;

B.     For judgment directing defendants to disgorge all fees obtained from their misrepresentations and failures to disclose.

C.     For an order awarding Plaintiffs' damages in an amount to be proven at trial, together with pre-trial and post-trial interest thereon;

D.     An award of punitive charges against each defendant.

E.     For judgment awarding Plaintiffs' attorneys' fees, litigation expenses, and costs of suit; and

F.     For such other and further relief as this Court deems just and proper.


## JURY DEMAND

WHEREFORE Plaintiffs' hereby demand a trial by jury on all issues that are triable to a jury.

Dated: September _20_, 2012

Case 4:13-cv-00803-BP   Document 3-1   Filed 08/16/13   Page 71 of 100

Respectfully submitted,

**ROUSE HENDRICKS GERMAN MAY PC**

Randall E. Hendricks MO #24832
Lawrence A. Rouse MO #25064
1201 Walnut, Suite 2000
Kansas City, MO 64106
Telephone: 816-471-7700
Facsimile: 816-471-0794

**COUNSEL FOR PLAINTIFFS**

35

Certificate of Service

I hereby certify that the above First Amended Petition was served by mail and email on Joe Rebein, **Shook Hardy & Bacon, 2555 Grand Blvd., Kansas City, Missouri 64108,** as counsel for defendants.

Randall E. Hendricks

36

# IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI
## AT INDEPENDENCE

RE:    **STAHR D ASHURST ET AL V J P MORGAN RETIREMEN ET AL**
CASE NO:    **1216-CV23784**

TO:    **RANDALL E HENDRICKS**
       **1201 WALNUT SUITE 2000**
       **KANSAS CITY, MO 64106**

We have received pleadings, which you submitted for filing in the case and they have been file-stamped on 9/20/2012. However, your pleading cannot be processed further until the following action is taken:

**RULE 3.2 - STYLE**
☐ **Additional service instructions are needed.**
XX☐ Please furnish __7__ additional service copies.

**RULE 4.2 (2)**
☐ Need Circuit Court Form 4

**RULE 5.6 – COLLECTIONS OF DEPOSIT**
☐ No fee received;
☐ Insufficient Filing Fee; Please Remit $ _____
☐ No signature on check
☐ No request to proceed in forma pauperis.
☐ No personal checks accepted.

**RULE 68.1**
☐ Need Circuit Court Form 17

**RULE 68.7 – VITAL STATISTICS REPORT**
☐ Need Certificate of dissolution of marriage form.

**RULE 74.14 SUPREME CT – FOREIGN JUDGMENT**
☐ Authentication of foreign judgment required.
☐ Affidavit pursuant to Supreme Court Rule 74.14

**RULE 54.12 SERVICE IN REM OR QUASI IN REM ACTIONS**
☐ Affidavit for Service by Publication required pursuant to Supreme Court Rule 54.12c.
☐ Order for Service by Publication required pursuant to Supreme Court Rule 54.12c.
☐ Notice for Service by Publication required pursuant to Supreme Court Rule 54.12c.
☐ Affidavit for Service by Certified/Registered Mail pursuant to Supreme Court Rule 54.12b.

**XX☐ OTHER: PLEASE SEND 7 ADDITIONAL COPIES OF THE AMENDED PETITION FOR SERVICE ASAP SO THAT PROCESSING CAN BE COMPLETED. THANKS**
☐ Please take the actions necessary to comply with the Circuit Court Rules and your request will be processed.
☐ Name of County Sheriff and Sheriff's address not provided; Please forward service packets to the appropriate county for service (Summons packets attached)
☐ Sheriff's service fees not provided; Please attach Sheriff's fees to summons packet and forward to appropriate county for service (Summons packets attached)

**<u>Unless the additional information marked is received within 30 days of the date of this notice this case will be dismissed pursuant to Rule 37.4 for failure to prosecute without prejudice, at the Plaintiff's cost.</u>**

Please refer to the Court's website at www.16thcircuit.org for Court Rules or Forms.

COURT ADMINISTRATOR'S OFFICE
**DEPARTMENT OF CIVIL RECORDS**
CIRCUIT COURT OF JACKSON COUNTY, MISSOURI

_____
SEPTEMBER 21, 2012
Date

By _____
Deputy Court Administrator
308 West Kansas, Suite 204, Independence,
Missouri 64050

CIRCT 1029 (DMSLCI1) 08-2010

STAHR D ASHURST

        PLAINTIFF(S),                    **CASE NO. 1216-CV23784**

J P MORGAN RETIREMENT PLAN SERVICES LLC

        DEFENDANT(S).

## NOTICE OF CASE MANAGEMENT CONFERENCE FOR CIVIL CASE, ORDER FOR MEDIATION AND DESIGNATION OF TRIAL JUDGE

IT IS HEREBY ORDERED that the **Honorable Charles McKenzie** is designated as the trial judge in this matter.

NOTICE IS HEREBY GIVEN that a Case Management Conference will be held with the **Honorable Charles McKenzie** on February 7, 2013 in **Division 13** at 10:00 am, sitting at the Jackson County Courthouse Annex, 308 West Kansas, Independence, MO 64050.

All Applications for Continuance of a Case Management Conference should be filed on or before Wednesday of the week prior to the case management setting.

### IF FILED ON OR BEFORE DECEMBER 31, 2012

The Application For Continuance shall be filed with the Division 13 Judicial Law Clerk, Kathryn Cox, at the Kansas City Courthouse, 415 East 12th Street, Kansas City, MO 64106, who can be reached by e-mail (preferred) at kathryn.cox@courts.mo.gov, by phone at (816) 881-3624, or by FAX at (816) 881-3378.

### IF FILED ON OR AFTER JANUARY 1, 2013

The Application For Continuance shall be filed with the Division 13 Judicial Law Clerk, at the Jackson County Courthouse Annex, 308 West Kansas, Independence, MO 64050, who can be reached by e-mail (preferred) at kathryn.cox@courts.mo.gov, phone at (816) 881-3624, or by FAX at (816) 881-3378.

**Division 13 will physically relocate from the Kansas City Jackson County Courthouse to the Jackson County Courthouse Annex in Independence on December 19, 2012.**

Applications for Continuance of a Case Management Conference shall comply with Supreme Court Rule and 16th Cir. R. 34.1. Continuance of a Case Management Conference will only be granted for good cause shown because it is the desire of the Court to meet with counsel and parties in all cases within the first 4 months that a case has been on file. All counsel and parties are directed to check Case.net on the 16th Judicial Circuit web site at www.16thcircuit.org after filing an application for continuance to determine whether or not it has been granted.

A lead attorney of record must be designated for each party as required by Local Rule 3.5.1.

16CVNCM2010

A separate pleading designating the lead attorney of record shall be filed by each party as described in Local Rule 3.5.2. The parties are advised that if they do not file a separate pleading designating lead counsel, even in situations where there is only one attorney representing the party, JIS will not be updated by the Civil Records Department, and copies of orders will be sent to the address currently shown in JIS. The Designation of Lead Attorney pleading shall contain the name of lead counsel, firm name, mailing address, phone number, FAX number and E-mail address of the attorney who is lead counsel.

At the Case Management Conference, counsel should be prepared to address at least the following:

a. A trial setting;

b. Expert Witness Disclosure Cutoff Date;

c. A schedule for the orderly preparation of the case for trial;

d. Any issues which require input or action by the Court;

e. The status of settlement negotiations.

## MEDIATION

The parties are ordered to participate in mediation pursuant to Supreme Court Rule 17. Mediation shall be completed within 10 months after the date the case is filed for complex cases, and 6 months after the date the case is filed for other circuit civil cases, unless otherwise ordered by the Court. Each party shall personally appear at the mediation and participate in the process. In the event a party does not have the authority to enter into a settlement, then a representative of the entity that does have actual authority to enter into a settlement on behalf of the party shall also personally attend the mediations with the party.

The parties shall confer and select a mutually agreeable person to act as mediator in this case. If the parties are unable to agree on a mediator, the court will appoint a mediator at the Case Management Conference.

Each party shall pay their respective pro-rata cost of the mediation directly to the mediator.

## POLICIES/PROCEDURES

Please refer to the Court's web page www.16thcircuit.org for division polices and procedural information listed by each judge.


CHARLES H MCKENZIE

**Judge**

25-SEP-12

Copies mailed/faxed this 25-SEP-2012 to:

RANDALL E HENDRICKS, 1201 WALNUT SUITE 2000, KANSAS CITY, MO 64106



# ROUSE HENDRICKS
# GERMAN MAY
### PC

*1216-CV23784*

## FACSIMILE COVER PAGE

Sept. 25, 2012
<u>Date</u>

1
Number of Pages Including Cover

**TO:** Attn: Joyce

**COMPANY/FIRM:** Jackson County Clerks office

**FACSIMILE NO.** (816) 881-4410

**FROM:** Callie Reynolds @ RHGM

---

IF COPY IS ILLEGIBLE OR INCOMPLETE, PLEASE CALL 816-471-7700
IMMEDIATELY FOR RETRANSMISSION

---

### COMMENTS:

Re: 1st Amended Petition Ashurst v. JPM

-Please do not serve any of the listed defendants on the Amended Petition. We have personally served <u>Joe Rebein</u>, who Serves as counsel for the Defendants. Thank you & I will call later today to confirm you received the fax. —Callie.

This information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. Unauthorized use, disclosure or copying is strictly prohibited and may be unlawful. If you have received this communication in error, please immediately notify us at (816) 471-7700.

1201 Walnut • 20th Floor • Kansas City, Missouri 64106 • rhgm.com • 816.471.7700 • Fax 816.471.2221



# ROUSE HENDRICKS GERMAN MAY
## PC

## FACSIMILE COVER PAGE

Sept. 13, 2012
Date

1
Number of Pages Including Cover

TO: Attn: Joyce

COMPANY/FIRM: Jackson County Clerk's Office

FACSIMILE NO. (816)881-4410

FROM: Callie Reynolds @ RHGM

---

IF COPY IS ILLEGIBLE OR INCOMPLETE, PLEASE CALL 816-471-7700
IMMEDIATELY FOR RETRANSMISSION

---

## COMMENTS:

Re: Stahr Ashurst v JP Morgan.

– Please do not serve any Defendants listed on the Petition. An envelope will be placed in the mail today (09.13.12) for the return of the Interrogatories and Document Request packets. Thank you, Callie

This information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. Unauthorized use, disclosure or copying is strictly prohibited and may be unlawful. If you have received this communication in error, please immediately notify us at (816) 471-7700.

1201 Walnut • 20th Floor • Kansas City, Missouri 64106 • rhgm.com • 816.471.7700 • Fax 816.471.2221

Joyce—

Please mail back hard copies
of the Interrogatories and
Document Request forms from
the Ashurst v JPMorgan
case. Thank you very much
for your time and help!

— Callie Reynolds

FILED-CIRCUIT COURT
MADISON CO., JACKSON HOLE
2012 SEP 18 PM 1:50

# IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI, AT INDEPENDENCE
## SIXTEENTH JUDICIAL CIRCUIT OF MISSOURI
### (INDEPENDENCE)

Stahr D. Ashurst )
         et. al. )
   )
      PLAINTIFFS, )
   )
   vs. )     CASE NO. 1216-CV23784
   )     DIVISION 13 (Judge McKenzie)
J.P. MORGAN RETIREMENT PLAN )
SERVICES, LLC, )
         et. al. )
   )
      DEFENDANTS. )

## ORDER

Upon Plaintiffs' Motion for Leave and for good cause shown, it is hereby

ORDERED that the requested leave to file Plaintiffs' proposed Second Amended Petition

is granted and that the filing and service date for the Second Amended Petition is the date of this

Order.

_____
                        Judge McKenzie

_____, 2012
   Date

# IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI, AT INDEPENDENCE
## SIXTEENTH JUDICIAL CIRCUIT OF MISSOURI
### (INDEPENDENCE)

Stahr D. Ashurst )
                et. al. )
  )
                PLAINTIFFS, )
  )
vs. )      CASE NO. 1216-CV23784
  )      DIVISION 13 (Judge McKenzie)
J.P. MORGAN RETIREMENT PLAN )
SERVICES, LLC )
                et. al. )
                DEFENDANTS. )

FILED-CIRCUIT COURT
JACKSON CO. MO-1
2012 SEP 28 PM 4: 37

## MOTION AND MEMORANDUM FOR LEAVE TO FILE SECOND AMENDED PETITION

Pursuant to 55.33, Mo. R. Civ. P. 55.33, plaintiffs move for leave to file their Second Amended Petition. This motion is being presented sixteen days after the filing of the original Petition on September 12, 2012. The defendants, through their counsel, Joe Rebein and the Shook Hardy law firm, agreed to accept service of the Petition. By agreement, the defendants stipulated to a service date of September 19, 2012 for the original Petition.

On September 20, 2011, plaintiffs filed and served their First Amended Petition without leave of court because the defendants had not yet served a responsive pleading. Rule 55.33 gives a plaintiff the right to amend its pleading once as a matter of course at any time before a responsive pleading is served. Otherwise, the pleading may be amended only by leave of court and leave shall be freely given when justice so requires.

Plaintiffs' Second Amended Petition adds a Count V for violations of Missouri's securities law. See the Second Amended Petition attached hereto as Exhibit A. Plaintiff is

1

asking the court to issue its proposed Order that grants leave to file this Second Amended Petition with the new Count V.

Justice is served by filing this Second Amended Petition as plaintiffs have determined through recent research that this Missouri statutory law violation should be presented given the facts uncovered in plaintiffs' investigations. And, since the defendants have not yet pleaded in response, there is no prejudice to defendants in permitting leave to file.

WHEREFORE, plaintiffs respectfully requested the court's leave to file the attached Exhibit A.

Respectfully submitted,

**ROUSE HENDRICKS GERMAN MAY PC**

Randall E. Hendricks  MO #24832
Lawrence A. Rouse MO #25064
1201 Walnut, Suite 2000
Kansas City, MO 64106
Telephone: 816-471-7700
Facsimile: 816-471-0794

**COUNSEL FOR PLAINTIFFS**

2

<u>Certificate of Service</u>

I hereby certify that the above Motion, the Second Amended Petition and the proposed Order was served, on September 28, 2012, by U.S. mail and e-mail on Joe Rebein, **Shook Hardy & Bacon, 2555 Grand Blvd., Kansas City, Missouri 64108**, as counsel for defendants.

Randall E. Hendricks

# EXHIBIT A

1

# IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI, AT INDEPENDENCE
## SIXTEENTH JUDICIAL CIRCUIT OF MISSOURI
### (INDEPENDENCE)

Stahr D. Ashurst )
1609 S. Whitney Dr. )
Independence, MO 64057 )
)
Valerie Arrocha )
3744 Elmwood )
Kansas City, MO 64128 )
)
LeAnn M. Belew )
521 SW Moore )
Blue Springs, MO 64014 )
)
Linda Sue Beltz )
2601 S. Milton Dr. )
Independence, MO 64055 )
)
Brandy Blackmon )
2617 N. Twyman Rd )
Independence, MO 64058 )
)
Lori Boniedot )
1331 S. Randall Rd. )
Independence, MO 64055 )
)
Sheila R. Brock )
2848 SW Carlton Dr. )
Lee's Summit, MO 64082 )
)
Kathleen Burmeister )
511 SE 19th St. )
Oak Grove, MO 64075 )
)
Jeanetta Cobb )
3605 NW Hidden Pointe Dr. )
Blue Spring, MO 64015 )
)
Kathy Cox )
405 N. Cochise Dr. )
Independence, MO 64056 )
)
Heather D. Craft )
1427 ½ South Sterling Ave. )

CASE NO. 1216-CV23784

DIVISION 13 (Judge McKenzie)

2

Independence, MO 64052                    )
                                          )
Brenda S. Dannaldson                      )
829 N. Ponca Dr.                          )
Independence, MO 64056                    )
                                          )
Cicilyn Davis                             )
4906 Wallace Ave.                         )
Kansas City, MO 64129                     )
                                          )
Terri Davis                               )
17917 S. Hilltop Rd.                      )
Pleasant Hill, MO 64080                   )
                                          )
Shirley Dieckhoff                         )
721 N. Sioux Ave.                         )
Independence, MO 64056                    )
                                          )
Gayla Dowell                              )
16921 York Ave.                           )
Independence, MO 64055                    )
                                          )
Heather Downey                            )
3572 NE Austin                            )
Lee's Summit, MO 64064                    )
                                          )
Wilma J. Ebert                            )
950 S. State Route 7                      )
Independence, MO 64056                    )
                                          )
Karen Euritt                              )
26307 E. Blue Mills Rd.                   )
Sibley, MO 64088                          )
                                          )
Margaret A. Evans                         )
10216 E. 96th St.              )
Kansas City, MO 64134                     )
                                          )
Sara Ferguson                             )
2905 NW 4th St. Terr.          )
Blue Springs, MO 64014                    )
                                          )
Cathleen R. Frantz                        )
707 W. Hwy 224                            )
Wellington, MO 64097                      )
                                          )

3

Lynn Frentrop
1213 NE 82nd Terr.
Independence, MO 64118

Charlene Fitzhugh
8708 E. 92nd Pl.
Kansas City, MO 64138

Kimberly Foudree
4424 NE Shadow Valley Cir.
Lee's Summit, MO 64064

Emily Galloway
3613 Lake Shore Dr.
Blue Springs, MO 64014

Sharon Grammer
2017 N. Ponca Dr.
Independence, MO 64058

Linda Green
6515 NW Quail Run Dr.
Parkville, MO 64152

Lynn Green
1410 E. Salem Ln.
Olathe, KS 66062

Patricia Hake
304 NE Forest Ave., Apt. C
Lee's Summit, MO 64063

Kayla Hale
526 El Lago Circle
Climax Springs, MO 64324

Minnie Henson
12206 E. 56th Terrace
Kansas City, MO 64133

Myrle Hill
5279 Spruce
Kansas City, MO 64130

Janice Hohenburg
16612 E. Gudgell, Apt. D

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

4

Independence, MO 64055          )
                                )
Deborah Hopkins                 )
19202 E. 28th St. S.            )
Independence, MO 64057          )
                                )
Vicki Hopkins                   )
27606 Rogers Rd.                )
Buckner, MO 64016               )
                                )
Lynn Huff                       )
3611 S. Bolger Ct.              )
Independence, MO 64055          )
                                )
Melanie Jefferson               )
1405 E. 66th St.                )
Kansas City, MO 64131           )
                                )
Soteria Jenkins                 )
2514 N. Six Mile Church Rd.     )
Independence, MO 64058          )
                                )
Cynthia Jones                   )
3337 Askew                      )
Kansas City, MO 64128           )
                                )
Robert Kordalski                )
17925 Mission Rd.               )
Stillwell, KS 66085             )
                                )
Tamara Liber                    )
19703 NE 197th Terr.            )
Smithville, MO 64089            )
                                )
Paula Luna                      )
200 S. Shrank Ave.              )
Independence, MO 64056          )
                                )
Pamala McGee                    )
1900 N. Concord Rd.             )
Independence, MO 64058          )
                                )
Leona McGinnis                  )
16414 E. Cogan Rd.              )
Independence, MO 64055          )
                                )

5

Michael McMurray )
506 Deer Ln. )
Pleasant Hill, MO 64080 )
)
Saundra McRae )
34609 Pink Hill Rd. )
Grain Valley, MO 64029 )
)
Cecil Morris )
3813 SW Windmere Dr. )
Lee's Summit, MO 64082 )
)
Sandra Oertwig )
E. 20th St. S. )
Independence, MO 64050 )
)
Tamara O'Hare )
5401 S. Harding St. )
Oak Grove, MO 64075 )
)
Sheri Orr-Davidson )
17676 N. Union Rd. )
Lawson, MO 64062 )
)
Jo Parker )
6414 Ridgeway Ave. )
Kansas City, MO 64133 )
)
Diane Postlethwait )
3603 S. Drumm Ave. )
Independence, MO 64055 )
)
Bernice Pryor )
1801 E. 97th Terr. )
Kansas City, MO 64131 )
)
Linda Rohaus )
1124 SW Eastman St. )
Blue Springs, MO 64015 )
)
Connie Schmidt )
18004 E. 18th St. N. )
Independence, MO 64058 )
)
Beatrix Schmitt )
5702 N. Norton Pl. )

6

Gladstone, MO 64119 )
)
Shirley Scott )
19400 E. 37th Terr. Ct. S. Apt. 316 )
Independence, MO 64057 )
)
Peggy Smith )
12016 Markham Rd. )
Independence, MO 64052 )
)
Troy Spencer )
14350 W. 187th Terr. )
Olathe, KS 66062 )
)
Carolyn Thomas )
1903 E. 16th )
Kansas City, MO 64127 )
)
Deborah P. Thomas )
4020 Lawn Ave. )
Kansas City, MO 64130 )
)
Shanna Thompson )
31 NW 102nd St. )
Kansas City, MO 64155 )
)
Paris Valleau )
11623 E. 85th St. )
Raytown, MO 64138 )
)
Virginia Wanamaker )
1712 Ashley Dr. )
Independence, MO 64058 )
)
Joyce Webb )
7500 E 108th St. )
Kansas City, MO 64134 )
)
Cynthia White )
1300 Cottonwood Dr. )
Greenwood, MO 64034 )
)
Teresa White )
4009 S. Maybrook Ave. )
Independence, MO 64055 )
)

7

Chandra Williams                )
503 Palomino Ln.                )
Ogden, KS 66517                 )
                                )
Eavy Wilson                     )
8526 Bruns Rd.                   )
Richmond, MO 64085              )
                                )
Sheila Wittmeyer                )
36 Anchor Dr.                    )
Lake Tapawingo, MO 64015        )
                                )
Vicky Wooten                    )
503 SE 19th St.                  )
Oak Grove, MO 64075             )
                                )
Carolyn Woods                   )
523 S. Cedar Ave.               )
Independence, MO 64053          )
                                )
                                )
                                )
                                )
                   PLAINTIFFS,  )
                                )
        vs.                     )
                                )
J.P. MORGAN RETIREMENT PLAN     )
SERVICES, LLC,                  )
                                )
        and                     )
                                )
                                )
JP MORGAN CHASE & CO.           )
                                )
        and                     )
                                )
J.P. MORGAN INVESTMENT MANAGEMENT, )
INC., d/b/a JP MORGAN ASSET     )
MANAGEMENT                      )
                                )
        and                     )
                                )
J.P. MORGAN INVEST HOLDINGS, LLC )
f/k/a J.P. MORGAN INVEST, INC.  )

8

|                              |     |
|------------------------------|-----|
| and                          | )   |
|                              | )   |
|                              | )   |
| David Embry                  | )   |
|                              | )   |
| and                          | )   |
|                              | )   |
| Jennifer Mendicki O'Neill    | )   |
|                              | )   |
| and                          | )   |
|                              | )   |
| James E. Staley              | )   |
|                              | )   |
| DEFENDANTS.                  | )   |

## SECOND AMENDED PETITION

Plaintiffs allege as follows:

## INTRODUCTION

1.      This case arises from the false misrepresentations and willful misconduct by J.P. Morgan Retirement Plan Services, LLC ("JPMRPS") and its agents and co-conspirators, JP Morgan Chase & Co. ("JPMC"), JP Morgan Investment Management, Inc. ("JPMAM"), J.P. Morgan Invest Holdings, LLC, f/k/a J.P. Morgan Invest, Inc. ("JPMI") and the individual defendants, David Embry, Jennifer Mendicki O'Neill and James E. ("Jes") Staley, who were each officers or managers of JPMRPS or a controlling person of JPMRPS in a scheme by these defendants to violate the securities laws of Missouri, to violate of the Missouri's Merchandise Practices Act (MMPA), and to unlawfully enrich JPMRPS, and its agents or conspirators at the expense of the Plaintiffs.  All defendants are hereinafter collectively referred to as "JPM", "JP Morgan" or, at times, "defendants".

9

2.     The scheme to unjustly enrich JPM entailed the sale to the Plaintiffs of the stable value product, that JPM called "SAIF" (standing for "Stable Asset Investment Fund") and referred to herein as "SAIF", "JPM Stable Value Product" or "JPM Product". Defendants violated the Missouri securities laws and the MMPA and wrongly profited from the sale of the JPM Product by misrepresentations and willful, deceptive practices that induced Plaintiffs to purchase the JPM Product, while unbeknown to Plaintiffs, the hidden risks of the JPM Product belied the represented safety of the claimed superior yield performance, and the represented stability in the investment return of SAIF.

3.     Starting as early as 2005 (including specific meetings at GEHA's Missouri offices on March 19 and August 1, 2005 and just before July, 2006) and continuing through the first half of 2008 and thereafter, in meetings and contacts led by JPMRPS, the defendants conspired and acted in concert to represent to Plaintiffs and the Plaintiffs' agents that the JPM Product would give superior return, superior market-to-book value and at the same time employed less risk than other stable value products, when in fact it contained riskier, lower quality mortgages and other debt instruments, and riskier private, self-rated mortgages with overstated market value. This disguised higher risk (taken in an attempt to gain a higher yield) caused the JPM Product to perform poorly during the financial downturn, generally the last-quarter of 2008 through the present. As a part of a scheme to defraud, JPM misrepresented the market value of asset-backed or mortgage backed investments and the actual risk and the past performance of the JPM Product sold to Plaintiffs. Further, JPM misrepresented that the JPM Product had the same attributes, such as liquidity, as money market funds when, in fact, a sizable portion of the JPM product lacked liquidity.

Case 4:13-cv-00803-BP   Document 3-1   Filed 08/16/13   Page 93 of 100

4. Part of the scheme involved steering Plaintiffs' investment options away from safer and better-run stable value products, like the American Century Stable Value Product, for the purpose of getting Plaintiffs into the JPM Product from which JPM could earn multiple disclosed and undisclosed fees.

5. By the scheme, JPMRPS itself profited by receiving monies equal to 50% of the disclosed management fee and by earning or receiving other substantial internal incentive credits—all using misrepresentations to push SAIF over competing, superior stable value funds.

6. The allegations in this Petition are supported by findings of an arbitration panel that issued a $373 million award against JPMRPS on August 10, 2011 in connection with JPMRPS's promotion of the JPM Stable Value Product over the superior stable value product offered by American Century. Those findings were set out in a 72-page opinion of an independent panel consisting of a former judge and two AAA panel lawyer-arbitrators experienced in complex financial litigation. Each of the individual defendants were witnesses in that six week arbitration, which took place in February-March, 2011. As found by the arbitrators, the individual defendants (Embry and Mendicki O'Neill) "had their compensation impacted through bonus pool amounts...connected to the placement of JPMAM products and their personal employment positions informed by an understanding that sales and promotion of JPMAM products were more beneficial to their careers."

7. In meetings held just before the July 2006 transfer of over $30 million in plaintiffs' monies to the JPM Product, defendants represented that the JPM Stable Value Product was, "your most conservative investment option." In many forums, including its website and in multiple presentations, including presentations to Plaintiffs and to Plaintiffs' representatives,

11

JPMRPS and its agents/co-defendants misrepresented JPM Stable Value Product as having less risk and higher yield than other stable value products.

8.    JPMs' sales ploy was a ruse. While JPM touted the conservatism of its JPM Product, JPM in fact used its JPM Stable Value Product as a vehicle for placement of mortgages and other debt instruments having a higher risk (both liquidity and credit risks) and lower quality, hoping that by taking this hidden risk it could gain a higher yield.

9.    JPM's misrepresentations led to Plaintiffs' investment in the JPM Stable Value Product during the financial crisis that centered on the years between 2008-2010. At all material times, while defendants sold the JPM Product as a stable value fund, defendants were in fact diverting a substantial portion of the assets of the JPM Product into unduly risky mortgage-backed assets that were in many cases, generated, priced and even self-rated by a JPM affiliate company.

10.    JPM used the sales promise of an enhanced yield from its JPM Product (which it achieved by taking undisclosed and inappropriate risks, and by self-rating and valuing "Private Mortgages") to build its sales of the JPM Product, thereby earning multiple layers of fees, some undisclosed, that benefitted defendants. In sum, JPM employed deceptive practices in order to gain millions of dollars in fees.

11.    JPM knew, before the financial crisis, of the risks inherent in the JPM Product and thus to the safety of the JPM Product's yield versus other stable value products' yield. Through its scheme of misrepresentations and fraud defendants intentionally exposed Plaintiffs to future yield underperformance and liquidity constraints.

12.    JPM and affiliated companies decided in October 2006 – shortly before the subprime storm hit Wall Street and Main Street alike with full force – to dump major portions of

their then considerable investment positions in low quality mortgage assets. JPM knew that SAIF contained low-quality mortgage assets, yet sold SAIF to Plaintiffs as a low risk investment.

13. Starting in late 2006, JPM and affiliated companies had more than $12 billion of low-rated mortgage assets on JPM's "books". Thus at the same time that JPM and/or affiliated companies were selling their own positions in lower quality mortgages, similar low-rated and illiquid mortgage positions were placed in the JPM Stable Value Product, which was sold to Plaintiffs. While at the same time JPM was reducing its exposure to lower rated mortgage loans, it was marketing the SAIF with this increased risk exposure to purchasers of its JPM Stable Value Product, which, by representation, was supposed to combine the safest, most conservative investment choice and a higher yielding fund than other stable value products.

14. While this ploy benefited defendants in the accumulation of billions of dollars into the JPM Product, from which it reaped profits, it harmed Plaintiffs and other purchasers of the JPM Product, who were stuck with the significantly declining yield on risky mortgages starting in 2008. These higher- risk mortgage positions explain why the JPM Product temporarily outperformed competitor stable value funds until the start of the financial crisis, then fell behind its competitor funds, return-wise, by a wide margin. This ploy was not happenstance. By attracting Plaintiffs' investment monies by promising a safer product with higher yields, JPMRPS and its agents gained for themselves the earnings from the multiple fees charged for monies put into SAIF.

15. In November, 2008 and subsequent months, the JPM Product's market value fell to as low as the mid-80 percent. The average stable value fund at that time had market values in the mid-90 percent according to Hueler, an industry data reporting service.

16.     Through the aforementioned scheme of fraud and self-dealing, JPMRPS and its agents violated Missouri's Merchandise Practices Act and Securities laws and breached the duties set out in the counts presented below. These breaches have directly and proximately caused Plaintiffs to suffer significant financial harm. Damages to Plaintiffs have manifested themselves in, among other things, substantial diminution in their investment returns on the JPM Product. This action seeks to obtain relief from defendants' wrongful acts, including damages sustained by Plaintiffs and ill-begotten profits JPM got as a direct and proximate result of those acts.

17.     Defendants at all material times just before and during the financial crisis knew that a substantial portion of JPM's higher-risk mortgage and other assets, were being sold to Plaintiffs via touting SAIF as a "stable" and "conservative" investment product. Those moves were undertaken by defendants with an "eagle eye" to defendants' benefit and a callous indifference to the truth.

18.     Defendants' willful and malicious misconduct has directly and proximately harmed Plaintiffs.

## PARTIES

19.     Plaintiffs are employees of Government Employees Health Assessment (GEHA) which purchased and invested in the JPM Stable Value Product (sometimes referred to by JPM as "SAIF"), during approximately 2008-2010. GEHA is located in Jackson County, Missouri, with offices in Independence and Lee's Summit, Missouri where Plaintiffs were employed. It was in meetings in the GEHA offices that the misrepresentations by JPM took place.

20.     Plaintiffs' claims are brought against parties who disclaim that they are fiduciaries as defined by ERISA. Plaintiffs assert claims under Missouri law. In the Participation Agreement, Plaintiffs' Plan granted discretionary authority or control over management of the Plan or its assets to a non-party to this case, JP Morgan Chase Bank, N.A. The Plaintiffs' Plan gave only non-party Bank, N.A. management authority. Each defendant is being sued for its deceptive sales and marketing practices and violations of Missouri Securities law and the MMPA in which each defendant was part of the scheme to put forward willful deceptive misrepresentations about the safety of SAIF's investment return and other attributes. The alleged scheme is about deception and willful misconduct in the sale by defendants of the JPM product to Plaintiffs.

21.     JPMRPS is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business now located at the Sprint Campus on College Boulevard, Overland Park, Kansas.  At the time of the acts alleged herein, JPMRPS was located on Ward Parkway in Jackson County, Missouri. JPMRPS participated, directly and indirectly, in the sale of securities, as defined by the Missouri Securities law, to Plaintiffs and participated in advising Plaintiffs as to the attributes of those securities.

22.     JPMRPS has at all relevant times represented that it is not an ERISA fiduciary to its client Plans. In its April 1, 2001 Agreement with the GEHA Plan Administrator, JPMRPS asserted that the "Plan Administrator is the fiduciary under the Plan". Further, in describing its services to the Plan, JPMRPS stated that it "shall be liable to the Plan or its Participants only for its negligent actions, negligent failure to act, or willful misconduct of itself or its agents, or as required by applicable law." By contract, JPMRPS sought to exclude ERISA liability.

Case 4:13-cv-00803-BP   Document 3-1   Filed 08/16/13   Page 98 of 100

23. Further, in its renewal and updated agreement(s), JPMRPS agreed and asserted that its services did not require it to: "act as a fiduciary with respect to the Plan or to exercise any discretionary authority or discretionary control with respect to the. . . assets of the Plan" and that "its relationship" with the Plan Sponsor was "that of independent contractor."

24. The SAIF was and is "established, operated and maintained" exclusively by an entity not a party to this case, the SAIF Trustee JP Morgan Chase Bank, N.A. (Bank, N.A.). In its Declaration of Trust, Bank, N.A. alone assumed the role of Trustee and ERISA fiduciary:

> Section 1.1. **Title.** "The title of the trust fund hereby established shall be "Commingled Pension Trust Fund (Stable Asset Income) of JPMorgan Chase Bank, N.A." (formerly known as the Bank One Asset Income Fund)."

> Section 1.2. **Purpose.** "JPMorgan Chase Bank, N.A., a national banking association. . . is adopting this Declaration of Trust as successor trustee to the Bank One Trust Company, N.A. of the Bank One Stable Asset Income Fund. . . This commingled trust fund is established, operated and maintained by JPMorgan Chase Bank, N.A. exclusively as a medium for the collective investment and reinvestment, without distinction between principal and income, of moneys or other assets of participating trusts."

> Section 1.3. **Definitions.** ". . .(d) The term "Trustee" shall mean JPMorgan Chase Bank, N.A. . ."

> Section 1.4. **Effect of Declaration of Trust.** "The provisions of this Declaration of Trust, as the same may be amended from time to time, shall control all participations in the Commingled fund and the rights and benefits of all persons interested in such participations as beneficiaries or otherwise. "

> Section 4.1. **Title, Custody and Location Investments.** "The ownership of all of the assets in the Commingled fund shall be vested solely in the Bank as Trustee and shall be considered as assets held by it as Trustee."

16

*Section 4.3.* **Additional Investment Provisions.** ". . . the Trustee shall have the power to: (1) invest and reinvest any moneys at any time forming any part of the Commingled fund in any property. . .

Trustee shall invest the assets of the Commingled Fund in a manner consistent with the provisions of ERISA. . .(e) The decision of the Trustee as to whether or not an investment is of a type which may be purchased for the Commingled Fund shall be conclusive."

*Section 4.4.* **Additional Powers of the Trustee.** ". . . (g) to cause or authorize any investments from time to time held by it to be registered in, or transferred into its name as Trustee, or the name of its nominee, or in the name of any other nominee, or to retain them unregistered or in form permitting transferability by delivery; and to deposit any such investments in or with any depositary, sub-custodian, clearing corporation, or any central system for handling of investments, or any nominee thereof; but the books and records of the Trustee shall at all times show such investments are part of the Commingled fund;. . ."

*Section 5.1.* **Division into Units.** "The Commingled Fund shall be divided into units and the proportionate interest of each participant shall be evidenced by the number of units and fractions of a unit allocated to it based upon the amount of the moneys of such participant paid into the Commingled fund. The original value of each unit of participation shall be determined by the Trustee. . ."

*Section 6.1.* **Frequency of Valuation.** ". . .the Trustee shall determine the value of the Commingled Fund and the units thereof in the manner prescribed in this Declaration of Trust. . ."

*Section 8.1.* **Participation Records.** "Records shall be maintained for the Commingled Fund which shall show with respect to each participant:

(a) The date of each admission to the Commingled Fund, the number of units allotted and the amount paid therefor;

17

Case 4:13-cv-00803-BP Document 3-1 Filed 08/16/13 Page 100 of 100